1   BRUCE R. MUNDY
    Nevada State Bar No. 6068
2   200 South Virginia Street, Eighth Floor
    Post Office Box 18811
3   Reno, Nevada 89511-0811
    775•851•4228
4   reno-attorney@sbcglobal.net
    Attorney for: Bradley J. Mamer
5

6                   UNITED STATES DISTRICT COURT
7                IN AND FOR THE DISTRICT OF NEVADA

8   BRADLEY J. MAMER, and DOES I-X,          Case No.:  3:12-cv-00381-ECR-VPC
9   Inclusive,

10                 Plaintiffs,

11  vs.

12  ALBERT D. SEENO, JR., an individual;     **SECOND AMENDED COMPLAINT**
    THOMAS A. SEENO, an individual;
13  ALBERT D. SEENO, III, an individual;     JURY DEMAND
    MICHAEL P. GHIORSO, an individual;
14  KEVIN P. MCCAULEY, an individual;
    EMILIA K. CARGILL, an individual; and
15  DOES I-X, inclusive, and
    WINGFIELD NEVADA GROUP
16  MANAGEMENT COMPANY, LLC, a
    Nevada company, and ROE
17  CORPORATIONS XI through XX,

18                 Defendants.
    _____/
19

20       Plaintiff, BRADLEY J. MAMER, by and through his counsel, BRUCE R. MUNDY, as

21  and for causes of action hereby aver and allege as follows:

22                      **JURISDICTION AND VENUE**

23       1.    This Court has jurisdiction over this dispute under 28 U.S.C. §1331 because the

24  claims, pursuant to 18 U.S.C. §§ 1341, 1343, 18 USC §1961 et seq., 21 U.S.C. §201 et seq., and

25  29 U.S.C. §2601 et seq. are federal question claims under the statutes of the United States.  The

26  Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over the other claims because

27  they are so related to the federal question claims that they form part of the same case or

28  controversy.  Pursuant to 28 U.S.C. §1391, venue is proper in this district because a substantial

part of the complained of events or omissions occurred within the State of Nevada.

2.      The true names, capacities or involvement of the DOE and ROE defendants named herein are unknown to Plaintiffs, who therefore, sues said defendants by fictitious names.  The Plaintiffs are informed and believe and thereon allege that those persons or entities are affiliated with the Plaintiffs, the partners, owners, shareholders, agents, employees, parent corporations or subsidiaries which are the alter egos of the defendants named herein.  Plaintiffs pray leave to amend this complaint to show their true names and capacities when the same have been finally determined.  Plaintiffs are informed and believe and thereon allege that each of the defendants named herein as DOE and/or ROE is legally responsible in some manner for the events and happenings herein referred to in this lawsuit.

3.      Plaintiff hereby requests a jury trial relative to all issues so triable.

**DESCRIPTION OF PARTIES**

4.      Plaintiff Bradley J. Mamer ("Mamer") is an individual and has been a resident of Clark County, Nevada for the past six years.  Mamer personally owns profit interests in two Nevada entities that are part of a holding company known as the Wingfield Nevada Group Holding Company LLC ("WNG HOLDING"): Coyote Springs Investment LLC and Red Hawk Land Company, LLC.  The WNG HOLDING business entities are primarily engaged in the development, sale and operation of real estate managed by some or all of the Seeno defendants. The Seeno defendants are also the sole capital members and majority owners of WNG HOLDING.  Mamer was a seventeen-year senior executive for several of the WNG HOLDING entities, including its predecessor, Loeb Enterprises, LLC, and its management company, Wingfield Nevada Group Management Company LLC ("WNG MANAGEMENT") until he was constructively discharged, on or about December 2011, by the Seeno defendants.

5.      Defendant Albert Seeno, Jr. (hereafter "Albert Seeno, Jr." or "Seeno, Jr."), on information and belief, is a California resident who individually or through a trust owns an interest in Nevada entities that own and operate several Nevada casinos, including the Peppermill Resort and Casino in Reno, the Rainbow Club in Henderson, Western Village Casino in Sparks, and, regularly does business in Nevada.  On information and belief, Seeno, Jr. owns and operates

the Albert D. Seeno Construction Company and a large number of affiliates which regularly do business in California and some of which do business in Nevada (collectively, the "Seeno Company" or "Seeno Companies"). Defendant Albert Seeno, Jr., either personally or through entities owned or controlled by him, has an ownership interest in WNG HOLDING. Defendant Albert Seeno, Jr. is a sophisticated businessman with years of experience in buying and selling land, operating businesses, and negotiating contracts.

6. Defendant Thomas A. Seeno (hereafter "Tom Seeno"), is the brother of Albert Seeno, Jr. and is, on information and belief, a California resident, an owner or investor, either directly or indirectly, in the above-mentioned Nevada casinos and who individually or through a trust owns an interest in the Peppermill Resort and Casino in Reno, the Rainbow Club in Henderson, and Western Village Casino in Sparks, Nevada. On information and belief, Tom Seeno is currently the majority owner of WNG HOLDING. Tom Seeno continuously does business in Nevada. Defendant Tom Seeno is a sophisticated businessman with years of experience in buying and selling land, operating businesses, and negotiating contracts. On information and belief, Tom Seeno owns and manages some or all of the Seeno Companies.

7. Defendant Albert Seeno, III (hereafter "Albert Seeno, III" or "Seeno, III"), is the son of Albert Seeno, Jr. and is, on information and belief, a California resident, an owner, manager, trust beneficiary, or investor, either directly or indirectly, in the above-mentioned Nevada casinos and WNG HOLDING, and who continuously does business in Nevada. Defendant Albert Seeno, III is a sophisticated businessman with years of experience in buying and selling land, operating businesses, and negotiating contracts. On information and belief, Seeno, III owns and manages some or all of the Seeno Companies.

8. Albert Seeno, Jr., Tom Seeno, Albert Seeno, III (collectively the "Seeno Defendants"), or their affiliated entities, are the majority owners of a hotel/casino in Reno, Nevada, as well as other hotel/casino and gaming properties in Nevada. Albert Seeno, Jr. and Albert Seeno, III are associated with organized crime networks, have associated with and are associating with known felons, have paid multi-million dollar settlements for prior violations of

Nevada gaming and federal environmental laws, and, along with the DOE and ROE defendants, were raided and are under investigations by agents of the FBI, IRS and Secret Service. The Seeno Defendants collectively through various business entities own companies worth in excess of four billion dollars ($4,000,000,000.00). The collective net worth of the individual defendants is between one hundred million dollars ($100,000,000.00) and two billion dollars ($2,000,000,000.00).

9.      Defendant Michael P. Ghiorso ("Ghiorso"), on information and belief, is a California resident and works for the Seeno Defendants as the Director of Operations for WNG MANAGEMENT. On information and belief, on or about June 2008, and prior to his employment at WNG MANAGEMENT, defendant Ghiorso was issued an Order to Show Cause by the Insurance Commissioner of the State of California (the "Commissioner") claiming defendant Ghiorso and his business partner, Mitch Buich, (sometimes collectively "Respondents"), ignored a prior California Department of Insurance warning and continued to sell an insurance product in willful violation of section 700(a) and (b) of the California Insurance Code. On information and belief, Respondents entered into a Stipulation and Waiver as a means of achieving final resolution and settlement of these matters, and on or about July 2008, they were denied by the Commissioner an unrestricted vehicle service contract provider license, and were ordered to pay a fine of sixty thousand dollars ($60,000.00).

10.     Defendant Kevin P. McCauley ("McCauley"), on information and belief, is a California resident, was a licensed Certified Public Accountant ("CPA") in the state of California, and works for the Seeno Company as its Chief Financial Officer. On information and belief, McCauley's CPA's license was issued in California on December 05, 1980, but was cancelled on September 30, 1987.

11.     Defendant Emilia K. Cargill ("Cargill"), on information and belief, is a Nevada resident, was admitted to the State Bar of Nevada on March 3, 1998, said license is active, was admitted to the State Bar of California on August 10, 1998, said license is inactive, primarily works in Nevada for the Seeno Defendants as Senior Vice President and General Counsel of

WNG MANAGEMENT, but regularly travels to and works in an office at the Seeno Company headquarters in Concord, California, transacting business in California, including offering legal opinions.

**OVERVIEW**

12. This case is about a long term, rewarding, and productive employer-employee relationship turned into a lawless and hostile environment by the Defendants through a pattern of racketeering activity, including a threat of bodily harm made by Albert Seeno, III against Mamer, threats of severe bodily harm Albert Seeno, III ordered Mamer communicate to Mr. F. Harvey Whittemore ("Whittemore"), former Founder and Managing Person of WNG HOLDING and Chairman of WNG MANAGEMENT, extortionate threats Albert Seeno, III ordered Mamer to communicate to BrightSource Energy, a renewable power generation company and tenant of Coyote Springs Investment LLC ("CSI"), and other unlawful activity as defined in 18 USC §1961 and 18 USC §1962. This case involves a conspiracy of intimidation by the Defendants to deny Mamer's rights described in an agreement lawfully entered into with WNG MANAGEMENT, and to collect an unlawful debt. This case also involves Defendants' attempts to coerce plaintiff Mamer to use his institutional knowledge of the WNG HOLDING entities to further defraud Whittemore and the United States of America, and further involves breach of contract, tortious breach of the covenant of good faith and fair dealing, and unjust enrichment.

**GENERAL ALLEGATIONS**

13. On or around May 1994, plaintiff Mamer began work for the predecessor to WNG HOLDING, Loeb Enterprises, LLC. Mamer worked for David S. Loeb ("Loeb"), Co-Founder and Chairman of Countrywide Mortgage, at Loeb's private land development project, Wingfield Springs (aka, Red Hawk Land Company ("RHL") and The Resort at Red Hawk ("Red Hawk"), located in Sparks, Nevada. Through a series of promotions, Mamer worked as the Controller, Chief Financial Officer and General Manager of Loeb Enterprises, LLC until Loeb's untimely death on June 30, 2003.

14. Around this time period, Whittemore formed and was the owner of entities that

had an option to purchase real estate and water rights in the Coyote Springs valley northeast of Las Vegas, Nevada.  Loeb or his affiliated entities became investors and owners in these Whittemore investment entities, and together they or their affiliated entities purchased Coyote Springs Investment LLC ("CSI") on May 27, 1998 from Aerojet General Corporation. Whittemore and Loeb entitled the Coyote Springs property from May 27, 1998 until Mr. Loeb's death.

15.     Prior to his death, Loeb agreed to give Whittemore the right to purchase all of his and his family's interests in Red Hawk and Coyote Springs (the "Loeb Assets").  Whittemore completed the purchase of the Loeb Assets and combined the majority of his and his family's business holdings (the "Whittemore Assets"), including the former Loeb Assets, under the management of his staff at Red Hawk and Coyote Springs.

16.     On or about January 1, 2004, defendant Tom Seeno purchased a one-half (1/2) interest in the Whittemore Assets, including but not limited to, RHL and CSI, at a fair market price determined by the parties.

17.     All books and records for the Whittemore Assets and the affiliated companies were made available to Tom Seeno and his personnel for inspection and due diligence prior his purchase.  Tom Seeno and his personnel conducted extensive due diligence prior to his purchase of the interest in Whittemore Assets.  Following the acquisition, a computer link was installed whereby Tom Seeno and his personnel could access the company computers and all books and records of the company remotely at any time from California.

18.     Following the Tom Seeno acquisition, WNG HOLDING was formed as a Nevada limited liability company on May 28, 2004. On or around this same time, WNG MANAGEMENT was reformed as a Nevada limited liability company.

19.     For the next several years, the company was managed and owned by Whittemore and Tom Seeno, by or through their affiliated entities, with Whittemore acting in the capacity of Managing Person of WNG HOLDING, and the Chairman of WNG MANAGEMENT.

20.     During this period of Whittemore and Tom Seeno ownership and management,

Whittemore, on behalf of CSI, negotiated and closed a real estate transaction with an entity affiliated with Pardee Homes ("Pardee") whereby Pardee purchased land suitable for thousands of single family homes, multi-family homes, and custom lots from CSI's land development affiliate for a sum in excess of one hundred twenty five million dollars ($125,000,000.00).  In addition, Pardee had an option to purchase all of the Coyote Springs holdings for approximately one billion two hundred million dollars ($1,200,000,000.00), i.e., 30,000 developable acres of land at $40,000.00 per acre.

21.     On or around September 2004, plaintiff Mamer was promoted to President and Chief Executive Officer of WNG MANAGEMENT.  The Mamer promotion was recommended and approved by Whittemore, and, on information and belief, was completed with the knowledge of Tom Seeno and his staff.

22.     As part of his executive compensation, on or about January 1, 2005, plaintiff Mamer was offered and accepted a membership interest in CSI and RHL.  Mamer maintains both membership interests as part of his personal assets as of the filing date of this complaint.

23.     At Whittemore's request, during the spring of 2005 plaintiff Mamer began near-weekly travel from WNG MANAGEMENT'S home offices in Sparks, Nevada, to Las Vegas, Nevada, to lead development efforts for WNG HOLDING'S principal real estate investment, Coyote Springs.

24.     On or around February 2006, and after nearly a year of continuous weekly travel, plaintiff Mamer offered to relocate himself and his family from Sparks, Nevada to Las Vegas, Nevada, in an effort to support WNG HOLDING'S business goals. Terms of the relocation were negotiated by Mamer and Whittemore, on behalf of WNG MANAGEMENT, and were memorialized in that certain employment agreement  dated March 2, 2006 ("Relocation Agreement").  On information and belief, Tom Seeno or his personnel were given and reviewed a copy of this agreement prior to Mamer's relocation.

25.     Plaintiff Mamer asserts a key provision of the Relocation Agreement allowed him to sell his Las Vegas home ("Las Vegas Residence") should his employment be terminated from

WNG MANAGEMENT, or should there be a material change in his annual executive compensation.  Additionally, plaintiff Mamer asserts WNG MANAGEMENT agreed that if the Las Vegas Residence was sold at a loss, that he would recover his total investment from the sales proceeds, or from WNG MANAGEMENT, in the amount of three hundred seventy five thousand dollars ($375,000.00).

26.     In conjunction with the Relocation Agreement, plaintiff Mamer and Whittemore discussed a series of remodeling projects completed by a construction affiliate of Red Hawk Land Company LLC ("RHL") at the Mamer Sparks' residence, including the charges for the work.  During this discussion, plaintiff Mamer made Whittemore aware that most or all of the RHL work required replacement or reconstruction by other Nevada-licensed contractors, at an additional expense to Mamer because of RHL's substandard workmanship.  Plaintiff Mamer discussed legal recourse against RHL, or RHL's contactor's bond for this substandard work, but at Whittemore's request to look at the "big picture", including plaintiff Mamer's executive salary, bonuses and the profits interests in RHL and CSI.  Based on the Whittemore request, plaintiff Mamer agreed to pay the RHL charges through payroll deductions ("Mamer A/R"), so he could focus his energies on the success of the budding Coyote Springs project, which had the potential to more than compensate him in the long run for the RHL construction debacle.

27.     For the next few years, WNG MANAGEMENT withheld payroll deductions related to the Mamer A/R from plaintiff Mamer's salary.

28.     On information and belief, after the first Pardee Homes transaction was completed, Albert Seeno, Jr., Tom Seeno's brother, approached Harvey Whittemore and expressed a desire to buy an interest in WNG HOLDING.  On information and belief, Albert Seeno, Jr. previously spoke to Tom Seeno about WNG HOLDING and Tom Seeno provided an estimate of the value of the company.

29.     During this time, and as a result of the valuations established by an independent financing advisor hired by Whittemore and Tom Seeno for the Coyote Springs project, WNG HOLDING had a fair market value in excess of five hundred million dollars ($500,000,000.00).

30.     On or about September 2007, Albert Seeno, Jr. purchased approximately a one-third (1/3) interest in WNG HOLDING by purchasing approximately a 1/6th member's interest from Whittemore and a similar amount from entities controlled by Tom Seeno.

31.     Although the books and records of the companies were made available to Albert Seeno, Jr. prior to his purchase, Albert Seeno, Jr. or his personnel performed little or no due diligence prior to this purchase.

32.     The Mamer Relocation Agreement and Mamer A/R were obligations and assets of WNG MANAGEMENT and RHL, respectively, at the time of the Albert Seeno, Jr. acquisition.

33.     For the next two years, the company was managed and owned by Whittemore, Tom Seeno, and Albert Seeno, Jr., by and through their affiliated entities, with Whittemore acting in the capacity of Managing Person of WNG HOLDING and the Chairman of WNG MANAGEMENT.

34.     On or around November 2007, WNG HOLDING purchased all of the CSI membership interest, 1,000 Class A Membership Units, from former WNG MANAGEMENT executive and CSI member, Rob Derck.  On information and belief, the purchase price for the membership acquisition (the "Derck Acquisition") was one million three hundred thousand dollars ($1,300,000.00).   Tom Seeno and Albert Seeno, Jr. were aware of and approved the purchase of Derck's membership share in CSI, which was the same quantity and character as the membership share owned by plaintiff Mamer.  Prior to the closing of the Derck Acquisition, Whittemore offered to purchase the membership shares of plaintiff Mamer and other senior staff who owned profit shares in CSI (the "Class A Members"), stating he and the Seenos (Tom Seeno and Albert Seeno, Jr.) desired sole ownership of CSI.  On information and belief, none of these additional Class A Member acquisitions were completed by WNG HOLDING.

35.     Due to the continuing negative impacts from the national recession, on or around March 2008, WNG MANAGEMENT closed its Las Vegas executive offices and relocated senior staff to the undeveloped Coyote Springs site.  Given the remote nature and complete lack of commercial services at the job site, which was a one (1) hour commute (in each direction) from

Las Vegas, Whittemore approved and plaintiff Mamer implemented a series of ancillary benefits for senior staff, including but not limited to, company paid van pooling, company vehicles for work commuting, car allowances, shared office space at consultant's offices in Las Vegas, and flexible work schedules (including four (4) ten (10) hour work weeks, and work from home days). Given the lack of food and beverage services at or near Coyote Springs, many staff chose to work through lunch in order to shorten the workday.

36.     It was common knowledge plaintiff Mamer worked through lunch, worked during the two (2) hour commute to/from Coyote Springs, worked from home before/after normal business hours and on weekends, and worked from home on days he had other meetings or personal appointments in Las Vegas.  These work accommodations were common to all WNG MANAGEMENT senior staff located in southern Nevada, and continued for over two (2) years until Seeno, Jr. assumed the role of Managing Member of WNG HOLDING.

37.     On or around January 2009, senior WNG MANAGEMENT staff, including plaintiff Mamer, were made aware of significant tax problems affecting Tom Seeno, Albert Seeno, Jr. and other members of each Seeno brother's families (collectively the "Seeno Family" or "Seeno Taxpayers"). Senior WNG MANAGEMENT staff were told this challenge related to a failed tax shelter known as "SC2" that the Internal Revenue Service in April 2004 declared to be an abusive tax-avoidance scheme.

38.     On or about March 2009, during the period of Whittemore, Tom Seeno and Albert Seeno, Jr.'s ownership and management, Whittemore, on behalf of CSI, negotiated and closed a real estate transaction with a renewable energy company called BrightSource Energy ("BrightSource") with BrightSource leasing land suitable to construct a solar facility capable of generating 1,920 megawatts of electric power.  CSI estimated the value of this forty (40) year lease at over five hundred million dollars ($500,000,000.00), and under Whittemore's direction, senior WNG MANAGEMENT personnel, including plaintiff Mamer, undertook steps necessary to assist BrightSource Energy during its initial term of option.

39.     On or around April 2009, and as a result of a series of material changes to his

executive compensation resulting from company-wide recessionary reductions, plaintiff Mamer requested WNG MANGEMENT allow him to list and sell his Las Vegas residence pursuant to the Relocation Agreement.   In his capacity as Managing Person of WNG HOLDING and Chairman of WNG MANAGEMENT, Whittemore requested Mamer delay the sale, and instead, wait for the real estate market to recover before selling, to which plaintiff Mamer agreed to stay his decision.  As part of this agreement, Whittemore approved a suspension of payments related to the Mamer A/R.

40.    On or around May 2009, a small team of senior WNG MANAGEMENT accounting personnel, including plaintiff Mamer, Jim Harris ("Harris"), Chief Financial Officer of WNG MANAGEMENT, Corporate, and James England ("England"), Chief Financial Officer of WNG MANAGEMENT, Southern Nevada, each Certified Public Accountants in the states of Nevada and Utah, respectively, prepared a series of market value sensitivities for the collection of companies owned by WNG HOLDING.  Under the direction of Defendant McCauley, one of these valuations included a multi-million dollar contingent liability for a planned inter-basin domestic water transmission line (the "Water Transmission Project") necessary for development of Coyote Springs master planned community.  Plaintiff Mamer made Defendant McCauley aware the inclusion of the estimated Water Transmission Project cost, without the addition of planned water connection fees and/or other special water assessment offsets, common in southern Nevada, was contrary to the project's fiscal plan, and would, in Mamer's opinion, understate the fair market value of the company.

41.    On or about November 2009, Whittemore requested a larger number of senior WNG MANAGEMENT personnel, including plaintiff Mamer, attend an emergency meeting at WNG MANAGEMENT'S headquarters located in northern Nevada.  This meeting involved the previously described SC2 tax shelter.  Senior WNG MANGEMENT personnel were told this project was "company saving" in scope since the Seeno Taxpayers allegedly owed millions of dollars in federal taxes related to the abusive SC2 tax-avoidance scheme, which obligation was occurring at a time when the Seeno Family were facing significant re-margining actions on a

sizeable, personally guaranteed, cross-collateralized, commercial credit facilities.   Under the direction of defendant McCauley, the WNG MANAGEMENT team was instructed to further develop the intra-basin water transmission contingent liability for use in a pending Offer in Compromise (the "OIC Project") being prepared for presentation to the Internal Revenue Service. On information and belief, plaintiff Mamer deduced a major goal of the OIC Project was to show the Seeno Family Taxpayers had third-party debt and obligations which exceeded the liquidation value of their assets, with limited net worth for their Nevada gaming entity, and many homebuilding/land development companies.   On information and belief, the OIC presentation was meant to show this dire set of circumstances was directly impacting the Seeno Taxpayer's ability to generate the additional capital necessary to service the outstanding federal tax obligation.   On information and belief, the Seeno Family Taxpayers, therefore, offered a reduced cash settlement of the remaining SC2 debt.

42.     On information and belief, plaintiff Mamer contends the Seeno Family portion of the multi-million dollar Water Transmission Project contingent liability was purposefully used by the Seeno Taxpayers to understate the Seeno Family net worth during these OIC negotiations. Following this tax submittal, neither Tom nor Albert Seeno, Jr. instructed WNG MANGEMENT accounting staff to add or note this contingent liability on WNG HOLDING'S balance sheet.   On information and belief, neither Tom nor Albert Seeno, Jr. reported this claimed exposure to WNG HOLDING'S lenders.   On information and belief, this contingent liability was not ordered by either Seeno brother to be similarly characterized to WNG HOLDING'S bank appraisers.   On information and belief, had this contingent liability been valued by its bank appraisers in a fashion similar to the Seeno Family OIC net worth calculation, an immediate re-margining of the entire multi-million dollar WNG HOLDING loan would have likely resulted.   On information and belief, plaintiff Mamer alleges such a characterization of the Water Transmission Project was meant to intentionally deceive and mislead the United States of America, and may have further violated federal banking law.   Plaintiff Mamer believes such actions ordered by the Seeno Defendants has harmed and put at jeopardy his investment in CSI.

43.     On February 19, 2010, Mr. Larry Gunderson ("Gunderson"), Chief Financial Officer for defendant Tom Seeno, issued an email to WNG HOLDING'S bankers, owners and executives including plaintiff Mamer.  Gunderson's email described a multi-agency federal raid of the Seeno Company that took place the day before.  Gunderson explained "the purpose of this email is to advise you about an event that took place yesterday, February 18, 2010.  A team of agents from the FBI (Federal Bureau of Investigation), IRS (Internal Revenue Service), and U.S. Secret Service served search warrants on the offices of Discovery Builders (an affiliate of the Seeno Company) and Albert D. Seeno Construction Co. in Concord, CA (California).  Various files were removed.  We advised Wells Fargo Bank yesterday immediately after Albert (Albert Seeno, Jr.) informed Tom (Tom Seeno) of the events.  Albert told Tom that he thought they (the FBI, IRS and U.S. Secret Service) were investigating mortgage loans" (even though Albert Seeno, Jr. has subsequently advised others that the agents were looking for evidence of improper campaign donations in an effort to present a false light as to the real focus of the criminal investigation).  On information and belief, the mortgage loan investigation did indeed relate to loans originated and/or underwritten by an affiliate of the Seeno Company, for homebuyers of building affiliates of the Seeno Company.  On information and belief, an indictment involving these activities has been returned.

44.     On or about April 2010, due to the lasting effects of the national recession, and after working with Seeno Company staff reviewing construction activity at Coyote Springs, plaintiff Mamer came to believe that Albert Seeno, Jr. was disgruntled with his investment in WNG HOLDING.

45.     On or around July 2010, and following two ownership meetings with senior staff of both WNG MANAGEMENT and the Seeno Company, Albert Seeno, Jr. appeared to assume the role of Managing Person of WNG HOLDING and Chairman of WNG MANAGEMENT.  Soon thereafter, it became apparent that Albert Seeno, III also held a similar, if not official role.  Plaintiff Mamer does not remember formal announcements issued in either regard, and Whittemore continued his senior employment activities for WNG MANGEMENT.

46.     On or about August 20, 2010, Albert Seeno, III arrived in Las Vegas with an Information Technology supervisor from the Seeno Company home office in Concord, California, and met with WNG MANAGEMENT'S Information Technology Director, Aaron Hardinger ("Hardinger").   The purpose of this trip was to remove company computer servers from Hardinger's, Whittemore's and plaintiff Mamer's personal residences.  While this decision had been communicated by Seeno personnel to Whittemore and plaintiff Mamer on August 10, 2010, the actual date had not been set and the retrieval was completed in a clandestine-like manner. Prior to arrival at the Mamer Las Vegas residence, Albert Seeno, III, on information and belief, ordered Hardinger to enter Whittemore's Las Vegas residence without Whittemore's consent. Hardinger told plaintiff Mamer that Seeno, III ordered him, in all circumstances, to unlock and enter the Whittemore's home or face immediate termination, even though plaintiff Mamer specifically told Hardinger, prior to their arrival at the Whittemore residence, that neither he, Seeno, III, nor Seeno personnel were authorized to enter Whittemore's home without express permission. On information and belief, Hardinger entered the Whittemore residence and removed the company server.

47.     Shortly after the unauthorized entry to Whittemore's home, Hardinger's employment was terminated.   Plaintiff Mamer was told by a senior executive at WNG MANAGEMENT that Hardinger was fired for calling Whittemore in advance of the unauthorized entry into the Whittemore Las Vegas residence.

48.     As part of the transfer of payroll processing from WNG MANAGEMENT'S home offices at Red Hawk to the Seeno Company headquarters in Concord, California, on or around late August 2010, defendant McCauley met with plaintiff Mamer at Coyote Springs and asked about the outstanding Mamer A/R.  Plaintiff Mamer explained the nature of RHL's failed work, that he had to pay other Nevada-licensed contractors to replace or reconstruct substantially all of the RHL work, and that Whittemore had agreed the payment was suspended until such time as Mamer's salary was restored to the 2006 amount when he agree to pay the RHL bill.  Defendant McCauley asked no further questions about the Mamer A/R, and made no affirmative statements

1    regarding repayment.

2         49.    On or about September 3, 2010, plaintiff Mamer noticed a deduction from his pay

3    that he assumed was for the Mamer A/R he discussed with defendant McCauley.  This deduction

4    was listed as a "loan" repayment.  Plaintiff Mamer asserts this repayment was not discussed in

5    advance with him, that he did not verbally authorize the payroll deduction, nor did he sign an

6    authorization to reinstate this deduction.  On information and belief, plaintiff Mamer believes the

7    unauthorized deduction is a violation of Nevada law.

8         50.    On or about September 3, 2010, and based on a series of negative interactions

9    between Albert Seeno Jr. and Albert Seeno III, plaintiff Mamer believed his employment with

10   WNG MANAGEMENT was likely to be terminated soon.  On or around this date, plaintiff

11   Mamer expressed his concern to defendant Emilia K. Cargill ("Cargill"), Senior Vice President

12   and General Counsel for WNG MANAGEMENT, and asked her legal opinion regarding his

13   rights under the Relocation Agreement.

14        51.    On October 18, 2010, Seeno Human Resources Manager, Nancy Cassity

15   ("Cassity"), emailed plaintiff Mamer asking if any WNG employees had employment or

16   severance agreements, or other special vacation accrual arrangements.  At this time, Plaintiff

17   Mamer informed Cassity of the Relocation Agreement.

18        52.    On or about October 25, 2010 Whittemore, Cargill and a Seeno Company

19   representative met with military officials from the United States Air Force ("USAF") real estate

20   office and Nellis Air Force Base ("NAFB").  This meeting was convened to discuss concerns

21   officials at NAFB had expressed related to Coyote Springs, including housing proposed by

22   Pardee Homes and other builders, and the concentrating solar power towers proposed by

23   BrightSource Energy, all of which military officials thought would negatively impact the mission

24   of NAFB and other military agencies, branches, bases or installations. During this meeting a

25   possible land exchange of Coyote Springs for a Defense Base Closure and Realignment

26   Commission ("BRAC") site located in Concord, California was discussed.  On information and

27   belief, this Concord BRAC site was and is of great interest to the Seeno Defendants since they

28

own private residential/commercial land near or adjacent to this location. On information and belief, Seeno, Jr. had identified the Concord BRAC site to Whittemore as early as 2003, and had asked Whittemore's help in acquiring that site from the federal government prior to his investment in WNG HOLDING.  On information and belief, Whittemore expressed concern to the military officials that any actions involved in such discussions not be construed as a failure to operate in "good faith" under any of CSI's existing contracts or agreements, including agreements with Pardee Homes and BrightSource Energy. On information and belief, Whittemore stated that the military would need to initiate separate discussions with Pardee Homes and BrightSource Energy to avoid an anticipatory breach of existing options CSI had with each company, and to resolve issues related to actual lands and improvements at Coyote Springs owned and constructed by Pardee Homes. On information and belief, soon after this initial meeting, Whittemore was ordered excluded from subsequent meetings by the Seeno Defendants. Similarly, Mamer was excluded from all meetings related to this matter, including the initial meeting, even though he was President and Chief Executive Officer. On information and belief, the Seeno Defendants, or their agents, attended a series of meetings with the same or other military officials meant to advance a Seeno agenda, including but not limited to, the sale or exchange of the Coyote Springs site. On information and belief, the Seeno Defendants never told personnel or agents of Pardee Homes or BrightSource Energy of such discussions.  On information and belief, and beyond possible breaches under existing agreements with Pardee Homes and BrightSource Energy, the closed meetings without proper disclosure may breach the fiduciary duty Tom Seeno and Albert Seeno, Jr. owe to the remaining Class A Members of CSI, including plaintiff Mamer.

53.     Following the Cassity October 18th email, on or about October 2010, Albert Seeno, III convened a closed-door meeting at plaintiff Mamer's Coyote Springs office.  In attendance were Albert Seeno, III, a personal contractor friend of Seeno, III, and plaintiff Mamer.  Seeno, III angrily described the poor quality of the investment his family had made in purchasing WNG HOLDING, and told plaintiff Mamer, among other things, "Brad, the 'Seeno Way' is to bend someone over a saw horse and fuck them in the ass with no lube! We fuck everyone!" Plaintiff

Mamer discussed this troubling diatribe with defendant Cargill and a number of senior staff who worked at the Coyote Springs and northern Nevada corporate offices.  Plaintiff Mamer believed this comment was a threat, and that it most likely applied to the Relocation Agreement that had recently been disclosed to Cassity—as well as the disputed payroll deductions for the Mamer A/R.

54.    Following the "Seeno Way" threat, on or about October 29, 2010, plaintiff Mamer witnessed what he believed were unpermitted septic system installations at Coyote Springs (the "Septic System Installations").  On November 5, 2010, defendant Seeno, III's management of these installations was documented by his hand-written memorandum, scanned by his assistant, and emailed to plaintiff Mamer and other senior personnel at Coyote Springs.  This memorandum was also emailed to Seeno, III's father, Seeno, Jr.  The memorandum describes the septic holding tanks used to hold waste at Coyote Springs would no longer be needed since the seven (7) locations at which they were located had been tied into "existing septic" systems.  In reality, only one small permitted septic system existed at Coyote Springs that was close enough to the  Septic System Installations to possibly be used, with the other six (6) locations spread over an area exceeding two square miles.  Even the one location that was able to be tied into the small septic system required a permit to legally make such a connection.  Pursuant to WNG MANAGEMENT policy, Mamer discussed these installations with Cargill and a new senior Seeno Company executive, defendant Ghiorso.  Plaintiff Mamer stated he believed all work was unpermitted, that some locations were on lands owned by Pardee, and that at least one of these installations likely violated provisions of the federal Clean Water Act.  Defendant Ghiorso and Cargill told plaintiff Mamer they would deal with this matter, and defendant Ghiorso further stated something similar to staff, which plaintiff Mamer took to mean him, should not question such decisions made by Seeno, III. On information and belief, neither Seeno, Jr. nor Seeno, III contacted any Pardee Homes officials regarding the installations, even though this action could negatively affect Pardee's development plans.

55.    On November 11, 2010, plaintiff Mamer attended a meeting with Albert Seeno, III

related to Coyote Springs' golf operations.  This meeting included plaintiff Mamer, Seeno, III, Ayman A. Shahid, Seeno Company President of Sales and Marketing, Josh Whellams ("Whellams"), Director of Golf for Coyote Springs, and Karl Larcom ("Larcom"), Head Golf Professional for Coyote Springs.  Seeno, III angrily voiced the complaint that golf operations were losing over one million dollars ($1,000,000.00) a year, and his continued frustration with the poor quality of the investment his family had made in purchasing WNG HOLDING. Prior to this meeting, on information and belief, Seeno, III told Luke Solem, Director of Golf Maintenance for Coyote Springs, he would rather "crush" golf maintenance equipment with a Coyote Springs' backhoe than approve parts necessary for minor repairs.  At this November 11th meeting, Seeno, III told Mamer, Whellams and Larcom that Coyote Springs was "like a western movie set", meaning nothing was real, and concluded his heated discourse by saying if things didn't improve, replacements would simply arrive at Coyote Springs, and terminate plaintiff Mamer's, Whellam's and/or Larcom's employment.

56.    On or about November 29, 2011, plaintiff Mamer and Whellams were asked to attend a golf operations meeting with defendant Ghiorso.  While Ghiorso's role was never described in an interoffice memorandum, plaintiff Mamer realized he must have been hired as Mamer's supervisor.  Given Seeno, III's November 11th threats, plaintiff Mamer again assumed his employment with WNG MANAGEMENT would soon be terminated.

57.    On or about January 10, 2011, plaintiff Mamer received a letter at his home from General Counsel for the Seeno Company, Jeanne Pavao ("Pavao"), dated January 5, 2011.  The Pavao letter requested plaintiff Mamer execute a standard WNG MANAGEMENT loan repayment acknowledgement related to the Mamer A/R. This acknowledgement form was drafted years earlier to authorize company deductions against an employee's pay check for any loan or advance owed.   This letter was received by Mamer over four (4) months after WNG MANAGEMENT began making the unauthorized deductions, which Pavao memorialized as commencing on September 1, 2010.

58.    On or about January 19, 2011, plaintiff Mamer sent an email reply to Pavao, made

her aware of the Relocation Agreement, and offered a revision to the acknowledgement.  This counter-offer incorporated a provision that stated upon plaintiff Mamer's voluntary or involuntary termination from WNG MANAGEMENT, any remaining Mamer A/R balance would be offset by proceeds WNG MANAGEMENT would owe him according to the terms of the Relocation Agreement.

59.    On February 1, 2011, Seeno, Jr. and Seeno, III issued a revised employee handbook for employees of WNG MANAGEMENT (the "Seeno Handbook").  Many provisions from the prior employee handbook, dated August 15, 2009, and approved by Whittemore and plaintiff Mamer, were incorporated in the Seeno Handbook.   This included Section 8.2, Workplace Violence.  The Seeno Handbook states that "acts or threats of physical violence, including intimidation, harassment and/or coercion, which involve or affect the Company, or which occur on Company property, will not be tolerated."  The Seeno Handbook directs that, "all threats of (or actual) violence, both direct and indirect, should be reported as soon as possible to an immediate supervisor or any other member of management and our security staff."  The Seeno Handbook continues by saying, "the Company will promptly and thoroughly investigate all reports of threats of (or actual) violence and of suspicious individuals or activities.  The identity of the individual making a report will be protected as much as is practical."   This section concludes by saying,  "any employee determined to be responsible for threats of (or actual) violence or other conduct that is in violation of these guidelines will be subject to prompt disciplinary action up to and including termination of employment."

60.    On or around early February 2011, defendant McCauley began discussions with plaintiff Mamer regarding a planned WNG HOLDING federal tax deduction related to failed capital investments (the "Capital Loss Project") that were part of the unsuccessful PGA Village at Coyote Springs.  The magnitude of this tax deduction was significant, and was estimated by plaintiff  Mamer at over twenty five million dollars ($25,000,000.00).

61.    On or about late February 2011, plaintiff Mamer received a second letter at his home from Pavao dated February 23, 2011.  Based on her review of the Relocation Agreement,

Pavao stated the only remaining situation in which monies may be due would be if plaintiff Mamer moved to Coyote Springs. On information and belief, Pavao knew such a requirement was impossible since the Coyote Springs master planned community remained incomplete and lacked all required public municipal facilities (i.e., power, water and sewer service) necessary to construct and occupy a home or commercial businesses. On information and belief, Pavao was also aware no housing existed at Coyote Springs, and no other reasonable adjacent housing options existed for plaintiff Mamer, since the nearest residential community was over forty-five minutes from the undeveloped Coyote Springs site.

62. Since Whittemore personally negotiated and executed the Relocation Agreement on behalf of WNG MANGEMENT at a time in which he was so authorized, and prior to Seeno, Jr.'s investment in WNG HOLDING, plaintiff Mamer suggested any contract confusion expressed by Pavao was easily resolved by including Whittemore in these discussions. On information and belief, Seeno, Jr. never entertained such discussions with Whittemore, nor opened good faith negotiations with plaintiff Mamer. On information and belief, Seeno, Jr. instead ordered Pavao to write the February 23rd letter to plaintiff Mamer with an incorrect interpretation suggesting an impossible performance.

63. On February 25, 2011 plaintiff Mamer received an angry call from Albert Seeno, III in which he ordered plaintiff Mamer "to call Harvey (Whittemore) and tell him that he would fly up to Reno and break his fucking legs" if Whittemore failed to remedy a proposed delay to a pending lease payment from CSI's renewable power tenant, BrightSource Energy. Following his initial threat, Seeno, III continued by further ordering plaintiff Mamer to "tell Harvey (Whittemore) that I will take away his life if we don't get our money…he'll know what that means!" Plaintiff Mamer called Whittemore shortly thereafter and described the Seeno, III threats.

64. During the same February 25th telephone call, Seeno, III also ordered plaintiff Mamer to call CSI's renewable power tenant and tell its representative that "if BrightSource Energy did not make the lease payment on time, that he [Seeno, III] would hire the highest-priced

environmental attorney in San Francisco, secretly align himself [Seeno, III] with an environmental group, and shut-down the Ivanpah job site for at least three years!"  The Ivanpah project was the largest concentrating solar power generation site in the United States at the time, and was awaiting final approval for a massive one billion six hundred million dollar ($1,600,000,000.00) federal renewable power loan guarantee.  Seeno, III continued by bragging that he knew all about the National Environmental Protection Act ("NEPA"), the California Environmental Quality Act ("CEQA"), the Clean Water Act ("CWA"), and the Endangered Species Act ("ESA"), implying, plaintiff Mamer believed, Seeno, III had the necessary knowledge to complete his extortionate threat.  While driving home, plaintiff Mamer decided to refuse Seeno, III's orders to participate in what he believed to be extortion, and instead, planned to report these BrightSource Energy threats to Gunderson and appropriate WNG MANAGEMENT personnel.

65.     On or about the late evening of February 25, 2011, plaintiff Mamer received a call at his home from Gunderson.  During the ensuing conversation plaintiff Mamer reported the Whittemore and BrightSource Energy threats made by Seeno, III to Gunderson.  Gunderson told plaintiff Mamer, in his opinion, Seeno, III was "crazy" or "nuts", or both, and thanked plaintiff Mamer for not conveying the Seeno, III threats to BrightSource Energy's representative.  Plaintiff Mamer's wife, Christina M. Mamer, was present during this discussion with Gunderson.  The following week, plaintiff Mamer also discussed these threats with defendant Cargill and a number of senior WNG MANAGEMENT staff who worked at Coyote Springs and its northern Nevada corporate offices.

66.     Given his concern regarding the Whittemore and BrightSource Energy threats made by Seeno, III, plaintiff Mamer discussed this matter with his attorney, Bruce R. Mundy, upon return to his home on evening of February 25, 2011.

67.     On information and belief, on or about March 4, 2011, Whittemore reported these threats to police authorities.

68.     On or about March 4, 2011, Whittemore resigned from WNG MANAGEMENT.

On information and belief, plaintiff Mamer learned Whittemore's resignation was impelled by the threats made by Albert Seeno, III, and the flagrant disregard of a number of WNG MANAGEMENT'S policies by the Seeno Defendants.

69.     On or about March 4, 2011, affiliates of WNG HOLDING sued Pardee Homes in Nevada District Court effectively halting the initial municipal infrastructure Pardee was under contract to complete at the Coyote Springs site.  Plaintiff Mamer contends Seeno, Jr. was aware of this pending litigation when he ordered the Pavao February 23rd letter be sent to plaintiff Mamer.  On information and belief, the Pavao February 23rd letter was an intentional bad faith act by Seeno, Jr. meant to injure plaintiff Mamer's right to receive the benefits of the Relocation Agreement.

70.     On March 8, 2011, plaintiff Mamer responded to Pavao by company email offering his disagreement with Pavao's interpretation, and instead, pointed out the second two-pronged event providing for his decision to sell his Las Vegas home: (i) if his employment from WNG MANAGEMENT was terminated, or (ii) if there was a material change in his compensation.  In this regard, plaintiff Mamer made Pavao aware of the April 2009 discussions with Whittemore in which he requested WNG MANAGEMENT consent to the sale of his residence due to the material change in his compensation.

71.     On or around mid-March 2011, plaintiff Mamer received a third letter at his home from Pavao dated March 15, 2011.  In this letter Pavao made plaintiff Mamer aware that the company disagreed with his interpretation of the Relocation Agreement, and asked plaintiff Mamer to initial the current Mamer A/R balance.  Plaintiff Mamer initialed an internal email that described the Mamer A/R balance, but did not sign, nor was requested to sign, the standard WNG MANAGEMENT loan acknowledgement.  This and all related principal correspondence from and to Pavao was copied to Albert Seeno, Jr.

72.     On the same date as Pavao's March 15th letter, plaintiff Mamer received an interoffice email from Albert Seeno, Jr. titled "Expectations" that described five (5) projects Seeno, Jr. asked plaintiff Mamer to spearhead.  On March 30, 2011 plaintiff Mamer received a

second interoffice memorandum dated March 30, 2011 from Seeno, Jr. titled "Water Rights" that described a large research project related to WNG HOLDING'S water holdings that Seeno Jr. also asked plaintiff Mamer to lead.  While the Seeno, Jr. letters were positively written, Ghiorso subsequently told plaintiff Mamer, on a number of occasions, these letters were viewed by Seeno, Jr. and Seeno, III as plaintiff Mamer's "last chance" employment warnings.  Since plaintiff Mamer had never received an employment critique, warning or demotion in his seventeen-year career with entities that became part of WNG HOLDING, and instead, had experienced a progressive series of promotions and job praise, plaintiff Mamer found Ghiorso's comments threatening, and assumed, based on the timing of the first Seeno, Jr. letter, that the "last chance" warnings related to plaintiff Mamer's rejection of the WNG MANAGEMENT'S loan acknowledgement, and assertion of his rights under the Relocation Agreement.  In this regard, and assuming Ghiorso's threats were an accurate reflection of Seeno, Jr.'s and Seeno, III's opinions, plaintiff Mamer assumed the company intended to force his resignation as a defense against payment under the terms of the Relocation Agreement.

73.     On or about March 17, 2011, defendant McCauley convened the first face-to-face Capital Loss Project meeting with plaintiff Mamer and England at the Coyote Springs site. Defendant McCauley described that any write-off "needed to be retained at the Seeno level", with specific instructions to plaintiff Mamer and England to "exclude any benefits to Harvey (Whittemore)".  Defendant McCauley directed plaintiff Mamer to develop a historical factual pattern that supported these deductions being shifted from tax year 2009 (the year in which the PGA Licensing Agreement was terminated) to tax year 2010.  On information and belief, the shifting of this deduction was significant to the Seeno Defendants since in that tax year Whittemore had transferred some or all of his capital membership in WNG HOLDING to defendant Tom Seeno.  If the write-offs were part of an amended WNG HOLDING return for tax year 2009, on information and belief, Whittemore may have received his proportional share of this capital loss which could have totaled over nine million dollars ($9,000,000.00).  During the course of the Capital Loss Project, and on more than one occasion, plaintiff Mamer discussed

how troubling he felt McCauley's orders were with England.  Plaintiff Mamer expressed similar concerns in separate discussions with Gunderson and, on information and belief, with Harris.

74.     On March 23, 2011 defendant Ghiorso ordered plaintiff Mamer to change his work schedule to make sure Mamer was at the Coyote Springs' site from 8:00 am to 6:30 pm, Monday through Friday: a 10½ workday, plus a two (2) hour commute.  Ghiorso also ordered fellow Coyote Springs staff that commuted with plaintiff Mamer, including England and Manolito Amansec, Budget Analyst for WNG MANAGEMENT, to discontinue the non-work carpool activity.  While plaintiff Mamer complied with this order, the logic behind such on-site work hours, at a site with no construction activity, no housing, and no commercial facilities or services when plaintiff Mamer had laptop computer and remote server access from his home in Las Vegas, made little sense; especially given the Seeno, Jr.'s list of critical projects, and since Ghiorso had exerted complete control over all elements of golf management.  Plaintiff Mamer felt Ghiorso's orders to his fellow carpool riders was blatant harassment, especially since plaintiff Mamer, on a regular basis, worked on his laptop during the commute to and from the Coyote Springs site.  Plaintiff Mamer assumed these efforts were intended to further the Seeno Defendants' goals to force him to resign and forfeit his rights under the Relocation Agreement.

75.     As part of the March 23, 2011 discussion, plaintiff Mamer made Ghiorso aware that his arrival time at 8:10 am each workday (instead of earlier) was because plaintiff Mamer dropped off his disabled 12-year old son off at school in Las Vegas at 7:10 am.  Mamer told Ghiorso, "given our [Mamer and his wife] son's unfortunate emotional and behavioral challenges resulting from the removal of his right temporal lobe and remaining malignant brain tumor, my work hours previously allowed me to work early mornings and late evenings and weekends so that I could take charge of his at-home care.  For whatever reason, he [Mamer's disabled son] responds best to a father's level of authority and firm care, and unfortunately he [Mamer's disable son] has manipulated and/or frustrated ever baby-sitter we have found in Las Vegas."  Mamer received no comment or reply to this correspondence, and started working the required 10 ½ hour workday (plus two (2) hours of commute time).

76.     Following this meeting, both England and Amansec told plaintiff Mamer they feared they would lose their jobs if they continued to commute with him to the Coyote Springs site.  Since on or around March 2008, plaintiff Mamer, England, Amansec, and at times Cargill, had regularly commuted together to the Coyote Springs site.  After this date, plaintiff Mamer was forced to make the two hour commute alone even though other WNG MANAGEMENT staff were allowed to commute to Coyote Springs, including Ghiorso himself, who frequently commuted in a company vehicle from Las Vegas to the Coyote Springs site with Mr. Sal Evola ("Evola"), another WNG MANAGEMENT executive and relative of the Seeno Defendants.

77.     On April 25, 2011 Ghiorso ordered plaintiff Mamer expand his work schedule from 7:00 am to 6:00 pm (an 11-hour workday, plus two (2) hour commute).

78.     As part of the April 25, 2011 discussion, and after Ghiorso changed his hours to start at 7:00 am through 6:00 pm each workday, plaintiff Mamer requested WNG MANAGEMENT reconsider the mandated 11-hour on-site work day due to concerns plaintiff Mamer previously expressed about his twelve-year old disabled son's early morning care. Plaintiff Mamer asked that he be allowed to continue working the prior 10 ½ hour workday, and augment any other necessary work time remotely from home.  Ghiorso asked plaintiff Mamer to describe his circumstances in writing, which plaintiff Mamer completed that same day writing, "as we previously discussed around March 23rd, my only request for an 8:15am arrival was to help manage the care of our [plaintiff Mamer and his wife] disabled son."  Plaintiff Mamer continued by stating "this honestly has nothing to do with my commitment to the company, or a willingness to work hours before or after my onsite hours."  As defendant Cargill can attest, plaintiff Mamer continued, "my long-term work ethic for the company is supported by long hours both at work and at home" that "historically averaged over 60 hours per week."  On information and belief, this request was not seriously considered, nor was formally accepted or denied by either Ghiorso or WNG MANAGEMENT.  Mamer received no response to his request for reconsideration, and was not allowed to change his work schedule back to the prior's month's 10 ½ hour work day. On information and belief, such action or inaction by WNG MANAGEMENT

1   may be in violation with association provisions of the Americans with Disability Act of 2008

2   ("ADA").

3        79.     While informing Ghiorso that defendant Cargill could attest to plaintiff Mamer's

4   historical 60+ hour work week, plaintiff Mamer recognized "our [WNG MANAGEMENT'S] old

5   management structure allowed for flex hours at home which I [Mamer] realize is not our current

6   structure [under Seeno, Jr. and Seeno, III]."  Prior to plaintiff Mamer's relocation to Las Vegas,

7   and based on personal requirements related to the continuing care of his disabled son, plaintiff

8   Mamer requested Whittemore approve a flexible work schedule that would allow him to vary his

9   work time, days and work location, when necessary, to meet the needs of his disabled son's care.

10  Not only did Whittemore approve this personal request for plaintiff Mamer, Whittemore ordered

11  plaintiff Mamer enact a similar standard for any WNG MANAGEMENT personnel whose job

12  functions were not negatively affected by such flexibility.  In fact, WNG MANAGEMENT'S

13  approved employee handbook under Whittemore contained a provision stating "flexible

14  scheduling is available in some cases to allow employees to vary their starting and ending times

15  each day within established limits."  For all years prior to the Seeno, Jr.'s takeover of WNG

16  HOLDING, it was common practice to allow senior executives flexible hours and days, including

17  but not limited to, work from home, work from ancillary non-site offices, work from consultants'

18  offices, etc.  After the Albert Seeno, Jr. takeover of WNG HOLDING, the Seeno-amended WNG

19  MANAGEMENT employee handbook eliminated this provision.

20       80.     As part of the April 25, 2011 discussion, plaintiff Mamer was also told of another

21  material change to his executive compensation.  The company paperwork plaintiff Mamer signed

22  regarding this change did not describe this action was related to poor workmanship or similar

23  inadequate performance.

24       81.     On May 6, 2011, plaintiff Mamer advised the Seeno defendants and senior WNG

25  MANAGEMENT staff of a series of administrative violations to the Coyote Springs project's

26  various environmental permits.  Many of these violations related to fees due under the permits,

27  which were estimated by plaintiff Mamer to exceed one million three hundred thousand dollars

28

($1,300,000.00).   In addition to these direct fees owed, plaintiff Mamer described a series of indirect violations which required immediate attention.  Plaintiff Mamer recommended immediate compliance should be undertaken.  No action was approved by the Seeno Defendants, and, on information and belief, the Coyote Springs site may still be in violation of some or all of these violations.

82.     Sadly, on or around May 8, 2011, plaintiff Mamer's twelve-year old disabled son took an overdose of prescription medication to treat his traumatic brain injury.  On May 15, 2011, plaintiff Mamer made Ghiorso aware of this distressing incident telling Ghiorso that his [Mamer's] disabled son said he took the life-threatening dosage in the hope "it would help him be better".  Plaintiff Mamer said he would continue the eleven (11) hour mandatory workday, stating he would use accrued paid time off for any time necessary to manage his son's twenty-four hour care, and for visits to the psychiatric hospital to which plaintiff Mamer and his wife were committing their son.  In this regard, plaintiff Mamer stated he needed to take an afternoon off two (2) days later, using his accrued time off, to best coordinate his son's care.  Ghiorso's only comment, "Understandable."

83.     On or about June 1, 2011, BrightSource Energy terminated its lease with CSI.

84.     On June 10, 2011, plaintiff Mamer advised the Seeno defendants and senior WNG MANAGEMENT staff of a violation of Endangered Species Act related to a Coyote Springs environmental permit issued by U.S. Army Corps of Engineers (the "USACE Permit").  The violation involved non-compliance with a permit requirement related to a threatened species located at the site, the desert tortoise.  Compliance was estimated by plaintiff Mamer to cost WNG HOLDING no more than one hundred twenty five thousand dollars ($125,000.00), and plaintiff Mamer recommended immediate compliance should be undertaken.  No action was approved by the Seeno Defendants, and on information and belief, the Coyote Springs site is still in violation of this federal permit.

85.     On June 21, 2011, plaintiff Mamer was demoted by Albert Seeno, Jr., and was re-assigned to work under defendant Cargill's supervision as a "Forward Planner" for the Coyote

Springs project.  Other than the "last chance" memorandums, plaintiff Mamer previously received no critique, notice or warning of poor work, and was not afforded a face-to-face meeting explaining the change in job title and responsibilities.  Instead, plaintiff Mamer was copied on an internal memorandum copied to other senior executives describing his demotion, which was followed by a companywide memorandum describing plaintiff Mamer's new role working under defendant Cargill as a Forward Planner.  At this time, plaintiff Mamer was first offered an organizational chart that described defendant Ghiorso's role.

86.    As part of the June 21, 2011 discussion, plaintiff Mamer was told of another material change to his executive compensation.  The company paperwork plaintiff Mamer signed regarding this change did not describe this change was related to job performance even though he recognized the change in title was a demotion.

87.    During Whittemore's and plaintiff Mamer's management they approved defendant Cargill having flexible hours, flexible work days, and the ability to work from an office she leased from family friends (or from home) in Las Vegas in order to participate in her non-disabled son's care, and other school and social activities.  After the Albert, Jr. take-over of WNG HOLDING, defendant Cargill was allowed to continue such accommodations.  In fact, on or around October 2010, defendant Cargill bragged to plaintiff Mamer that she had informed Seeno, Jr. that the flexible work schedule was "part of her deal" when Whittemore hired her as General Counsel for WNG MANAGEMENT, and that Seeno, Jr. had approved the continuation of her accommodations.  On or around February 2011, Cargill's flexible work schedule continued even after such accommodations were removed from WNG MANAGEMENT'S employee handbook by Seeno, Jr. and Seeno, III.  Cargill's flexible work schedule continued after she was promoted by Seeno, Jr. as plaintiff Mamer's direct supervisor.

88.    On or about June 2011, and during an initial forward planning meeting convened by Cargill, and attended by Cargill, plaintiff Mamer, and fellow forward planners, Doug Carriger and Sal Evola, Cargill told Mamer he could discontinue the "crazy" 11-hour (plus 2 hour commute) onsite workday ordered by Ghiorso.  On information and belief, Cargill's action as an

attorney and an executive of the company was an admission that Ghiorso's mandated work hours for plaintiff Mamer alone was capricious and a violation of the Fair Labors Standards Act and the Family and Medical Leave Act.

89.     On August 17, 2011, plaintiff Mamer was instructed to begin work on another tax project that defendant McCauley said would include current and future obligations related to a series of acquisitions, licensing agreements, entitlements, improvements and sales that were part of, or related to, the Coyote Springs project.  As part of his orders, defendant McCauley outlined how this project was planned for use in a "massive fraudulent misrepresentation claim" against Whittemore (the "Fraudulent Misrepresentation Project").  Defendant McCauley explained to plaintiff Mamer that there were "a number of discoverable…material facts that Albert Jr. [Seeno, Jr.] was not made aware of (prior to his acquisition)", and that the Seenos needed to prove that "Harvey [Whittemore] was aware that project value was gone, and that he did not disclose these risks to Albert Jr. [Seeno, Jr.] at the time of his purchase"  Defendant McCauley continued by stating that without this evidence, Seeno, Jr. "would not get the tax write-off" planned by the Seeno tax team.  Defendant McCauley described the goal of the Fraudulent Misrepresentation Project was to establish a large three hundred million dollar ($300,000,000.00) to four hundred million dollar ($400,000,000.00) fraudulent misrepresentation claim, less any direct recovery, and "the planned recovery was to get the IRS [Internal Revenue Service] to accept at least a percentage of the larger claim".  This discussion made it plain to plaintiff Mamer why Seeno Defendants continued his employment.

90.     As part of the Fraudulent Misrepresentation Project, defendant McCauley also told plaintiff Mamer that "Harvey [Whittemore] misled Albert Jr. [Seeno, Jr.] on the value of Coyote Springs", and therefore, "Albert Jr. [Seeno, Jr.] paid too much for his share" of WNG HOLDING.  Defendant McCauley continued these allegations by stating "there are a number of material facts that have crawled out of the woodwork, not due to the recession, all of which were undisclosed liabilities known by Harvey [Mr. Whittemore]".  Since plaintiff Mamer was President & CEO prior to and after the Albert Seeno, Jr. acquisition of WNG HOLDING, plaintiff Mamer asked

McCauley why the Seeno Company had not performed any due diligence in advance of Seeno, Jr.'s forty four million dollar ($44,000,000.00) acquisition from Whittemore?  As a newly hired executive of the Seeno Company at the time of the acquisition, McCauley told plaintiff Mamer that due diligence materials were not requested by Seeno, Jr. because Seeno, Jr. "relied on the personal integrity of Harvey [Whittemore]".  McCauley also told Mamer the Seeno Company was busy with much larger projects, and that Seeno, Jr. told McCauley not to worry about the Coyote Springs investment since, in Seeno, Jr.'s opinion, it was a "small deal".

91.     On or about September 16, 2011, and at the end of a Forward Planning Meeting, but after Cargill had left for another meeting, plaintiff Mamer was told by Evola that Albert Seeno, Jr. and Albert Seeno, III had ties with members of the Hell's Angels and other felons (the "Evola Allegations"), including Albert Seeno, Jr.'s part-time chauffeur, and ranch care-taker, Mr. Victor Bustos ("Bustos").  Evola stated continued contact by the Seenos [Seeno, Jr. and Seeno, III] with known felons was a violation of Nevada Gaming Law, and that executives and family members of Seeno, Jr. and Seeno, III covered-up Bustos' continued close relationship.  On information and belief, Evola is a nephew of Albert Seeno, Jr., worked as a senior executive of the Seeno Company, or its affiliates, for over twelve years, was a long-time public official in the east bay of California, and was a fellow forward planner with Mamer.  Plaintiff Mamer had no reason to disbelieve Evola, and following this meeting plaintiff Mamer completed a quick internet search of the "Bustos and Seeno" alleged connection and found articles which seemed to verify Evola's statements, including references to illegal drugs, weapons, connections to members of the Hell's Angels, and a Nevada Gaming Control Board complaint filed against the Seenos [Seeno, Jr. and Seeno, III].

92.     While defendant Cargill was not present for the entire Bustos discussion between Evola and plaintiff Mamer, she was present when Evola stated his cellular phone was programmed to show incoming calls from Bustos were listed as "Norman" due to Gaming Control Board concerns.

93.     Given his concern regarding the Evola Allegations, plaintiff Mamer discussed this

matter with his attorney, Bruce R. Mundy, upon return to his home on the evening of September 16, 2011.

94.     On September 18, 2011, plaintiff Mamer submitted a written report (the "Bustos Report") to his supervisor, defendant Cargill, describing suspected violations of the WNG MANAGEMENT employee policies. Plaintiff Mamer also stated the substance of the report was hearsay, but if true, that he wanted to make it clear he refused to participate in any illegal activity. Beyond the Bustos-Seeno connection, plaintiff Mamer also told defendant Cargill that he felt Albert Seeno, III's "Seeno Way" and Whittemore "leg breaking" comments were meant as threats, and that he wanted to clarify he did not participate in the Albert Seeno, III ~~in the~~ Septic System Installations that he believed may have violated the federal Clean Water Act, all also, suspected violations of company policy.  Given the seriousness of his complaint, plaintiff Mamer told Cargill that he intended to use accrued Paid Time Off to consult an attorney and evaluate these matters.   Plaintiff Mamer instructed Cargill that he was sending this report from his personal email since Evola also said Albert Seeno, III had ordered Seeno Company Information Technology staff to "blind copy" select senior executive emails for his review.  Plaintiff Mamer did, however, blind-copy Gunderson, his attorney, Bruce R. Mundy, and his wife, Christina M. Mamer, on this email to Cargill sent from his personal email account.

95.     On or around thirty (30) minutes after the Bustos Report was transmitted to Cargill, Gunderson called plaintiff Mamer~'s~ at his residence. Gunderson stated it was an "interesting email", and explained that Bustos had been working for Albert Seeno, Jr. at one of Seeno, Jr.'s northern California ranches soon after the Final Stipulation For Settlement and Order was reached with the Nevada Gaming Control Board in 2004.  Mamer stated he found it stunning that Seeno, Jr. would employ Bustos if Evola's statements were true.  Gunderson replied that was just the way Seeno, Jr. and Seeno, III operated.  Gunderson did not say Evola's comments were false, and instead, characterized Evola as a "straight shooter" with whom he had a good relationship.  Gunderson stated Seeno, Jr. was fearful of going before the Gaming Control Board again, because any negative impacts to him would also impact those family members entitled to

gaming distributions from the trust Seeno, Jr. had formed to hold his interest in the Peppermill hotel/casinos/gaming holdings.  Plaintiff Mamer told Gunderson he assumed his report to Cargill was likely to lead to his termination, but after the "Seeno Way" threat, the Whittemore and BrightSource Energy threats, the unpermitted septic installations and possible violations of the Clean Water Act, and this latest incident, he found the new company policies and actions troubling; it seemed the law met nothing to Seeno, Jr. and Seeno, III, and plaintiff Mamer did not want to be dragged into any illegal activities.  Plaintiff Mamer told Gunderson, in his opinion, WNG MANAGEMENT under Seeno, Jr.'s and Seeno, III's leadership appeared to promote those who were willing to stretch or ignore the law so long as it pleased both Seenos.  Plaintiff Mamer said he felt defendants Ghiorso and Cargill seemed to fit this description.  Gunderson replied, from his experience, Ghiorso was a "loser" who had never had a successful prior career. Gunderson also said he used to have a good relationship with Cargill, getting on average three to five emails per day, but that since Cargill had "gone to the dark side", Gunderson only received one to two emails per month.  Plaintiff Mamer told Gunderson he never felt this way under the many years of Tom Seeno – Whittemore ownership and management, and Gunderson stated that neither Tom nor he would ask that of an employee…to which plaintiff Mamer agreed.  Plaintiff Mamer told Gunderson that at this point, he was simply asking WNG MANAGEMENT to honor the terms of the Relocation Agreement. Plaintiff Mamer did describe to Gunderson that earlier in 2011 Pavao had determined the company had no feasible obligations under the Relocation Agreement, since his movement to Coyote Springs was extremely unlikely.  Gunderson ended the call cordially by recommending plaintiff Mamer actively look for a new job.  In this regard, Gunderson told plaintiff Mamer he should feel free to call him anytime for advice, and offered to confidentially be listed as a personal reference.  Plaintiff Mamer's wife, Christina M. Mamer, was present during this discussion with Gunderson.

96.     On information and belief, WNG MANAGEMENT'S monthly Verizon invoice shows a detailed listing of all incoming/outgoing calls made on company cellular phones.  On information and belief, the described calls to/from Seeno, III, Whittemore, Mr. Mark Zahn

[BrightSource Energy] and Gunderson related to the BrightSource Energy delayed lease payment are contained in the detail listing for plaintiff Mamer's business cellular phone number.  On information and belief, Gunderson's lengthy call to plaintiff Mamer following the Bustos Report is similarly documented.

97.   The Bustos Report was sent to Cargill as General Counsel for WNG MANAGEMENT and plaintiff Mamer's supervisor, Sunday evening, September 18, 2011 at 6:34 p.m.  WNG MANAGEMENT'S reply was received by plaintiff Mamer less than two days later, on September 20, 2011 at 3:57 p.m.  This letter was authored by Cassity and characterized plaintiff Mamer's report as "highly inflammatory and inappropriate", that all statements he attributed to Evola were "untrue and highly slanderous", and that the "company and its owners have never asked you, nor would they ever ask any employee, to participate in any criminal activity".   Plaintiff Mamer was ordered by Cassity to "cease and desist...spreading these unsubstantiated statements," or face termination.   Plaintiff Mamer vehemently disputes all conclusions made by Cassity.

98.   On information and belief, the Bustos Report contained a number of historical allegations about the Seeno and Bustos relationship that were not part of the public press, and could not have been known by plaintiff Mamer but for Evola telling him.

99.   On or around September 20, 2011, plaintiff Mamer began a medically-ordered leave of absence. This was the first and only such leave of absence during plaintiff Mamer's seventeen-year employment history with WNG MANAGEMENT.

100.   On or around September 22, 2011, and due to an actual fear of physical harm for reporting suspected violations of WNG MANAGEMENT policies, plaintiff Mamer gave a sworn statement to preserve certain testimony related to what he believed were, in addition to violations of company policies, also unlawful activities perpetrated by the Seeno Defendants.

101.   On information and belief, Evola's twelve-year career working for his relatives at the Seeno Company, or its affiliates, was terminated shortly after the Bustos Report was sent by plaintiff Mamer to Cargill.

102.    On or around October 2011, and upon review of that certain Final Stipulation for Settlement and Order by and between the Nevada Gaming Control Board and Albert Seeno, Jr. , plaintiff Mamer acknowledges this settlement includes permissive language regarding Bustos' continued employment by Seeno, Jr., or at affiliates of the Seeno Company, and that this language may be in conflict with the Evola Allegations; however, plaintiff Mamer had no way of gaining this knowledge until he personally ordered and was handed a complete copy of the related Order, Complaint, First Amended Complaint and transcript from a representative of the State Gaming Control around this time.  Plaintiff Mamer leaves it to state gaming officials to determine whether Bustos' role working for Seeno, Jr. is in violation of the Nevada Gaming Settlement.

103.    On or about November 21, 2011, affiliates of WNG HOLDING sued BrightSource Energy in Nevada District Court.  Even though BrightSource Energy had terminated its lease on or around five months earlier, such an action, plaintiff Mamer contends, effectively halted replacement renewable power generation efforts at the Coyote Springs site.

104.    On or about December 26, 2011, plaintiff Mamer was constructively discharged from his seventeen-year executive career at WNG MANAGEMENT by the Seeno Defendants.

105.    On or about February 9, 2012, the Seeno Defendants sued plaintiff Mamer in Nevada District Court alleging among other things civil conspiracy, breach of contract, breach of implied covenant of good faith and fair dealing, and misappropriation of trade secrets.

106.    On or about February 27, 2011, plaintiff Mamer filed a civil complaint with the Southern Nevada Health District ("SNHD"), alleging, among other things, the Septic System Installations perpetrated by Seeno, III, and with the knowledge and approval of Seeno, Jr., may have violated county, state and federal laws.  On information and belief, investigation by the SNHD is on-going.

107.    On March 26, 2012, plaintiff Mamer received correspondence from the SNHD related to his civil complaint.  As part of this dialogue, SNHD informed plaintiff Mamer that it had been "asked by Emilia Cargill, Senior VP and General Counsel for Coyote Springs Land, to permit three holding tanks."  On or around April 2012, plaintiff Mamer was told the Septic

System Installations he observed being installed in October 2010 had been removed when he was not at the Coyote Springs site. This same source described to plaintiff Mamer that septic holding tanks had been reinstalled in place of the septic systems.  On information and belief, Seeno, Jr. and/or Seeno, III ordered such removal, with Ghiorso and Cargill aware of, or participants in, what plaintiff Mamer contends was an intentional cover-up.  Plaintiff Mamer has made SNHD investigators aware of his opinion, and further reviewed that certain June 2011 septic holding tank permit application, signed by defendant Cargill, that plaintiff Mamer told SNHD officials, in his opinion, contained false or misleading information.  Plaintiff Mamer also speculated that he believed the process of submitting for holding tank permits was meant to create opportunity for the Seeno Defendants, or Seeno, Jr. and Seeno, III, to plead to a lesser violation. On information and belief, SNHD is continuing its investigation of this matter.

108.    The Seeno Company, Seeno, Jr., and/or Seeno, III, have settled significant civil and criminal fines related to past environmental violations.  These include, but are not limited to, (i) a one million dollars ($1,000,000.00) criminal fine and restitution for destroying threatened frog habitat settled on or about July 19, 2002 (the "Red Legged Frog Settlement"), and (ii), a second statutory civil fine of two million nine hundred fifty thousand dollars ($2,950,000.00) for streambed alteration, water pollution and waste discharge violations on or about March 3, 2008 (the "Water Pollution Settlement").

109.    On September 24, 2004, the Nevada Gaming Control Board and Albert Seeno, Jr. agreed to a Final Stipulation for Settlement and Order (the "Nevada Gaming Settlement") which required, among other penalties, the payment of seven hundred seventy five thousand dollars ($775,000.00).  On information and belief, in a matter related to the Nevada Gaming Settlement, Albert Seeno, III agreed to a twenty five thousand dollar ($25,000.00) fine.  The Order, Complaint and First Amend Complaint to this settlement is based on Seeno, Jr.'s association with Bustos, other known felons, and members of the Hell's Angels, and for violations of state law and gaming regulations related to the Red Legged Frog Settlement.

110.    Significantly, 6 of the 10 counts described in the First Amended Complaint dealt

with environmental violations.  In this regard, and as detailed in the September 24, 2004 transcript before the State Gaming Commission, the lone dissenter to the Nevada Gaming Settlement, Commissioner John Moran, asked the record reflect his view that "when you have an action where there is an intentional destroying of habitat for a federally listed endangered species, that, to me, kind of tells me a lot about the person who is standing before me [describing Seeno, Jr.]."

111.    A cursory review of these environmental violations by Seeno, Jr. or his business affiliates supports Commissioner Moran's concerns.  The Red Legged Frog guilty plea was based on violations that took place on or around March 2001, with the plea recorded on or about July 2002.  The complaint for the Water Pollution Settlement was based on a series of Seeno, Jr. ordered violations that occurred during 2002, 2003 and 2004.  The Nevada Gaming Settlement complaint, which was based, in part, on the Red Legged Frog plea was recorded on or about March 2004, with the Final Stipulation for Settlement and Order recorded on or around September 2004.  The inspection which lead to the Water Pollution Settlement occurred on or about October 2005, with the Notice of Violation issued on April 2006, and the settlement reached on March 2008.  On or around July 2010, Seeno, Jr. assumed the role of Managing Member of WNG HOLDING, with Seeno, III acting in a lead management role.  On or about October 2010, Seeno, III ordered removal of septic holding tanks and the installation of unpermitted septic systems at Coyote Springs, in possible violation of the Clean Water Act since at least one of these installations was within or near a desert wash designated by the United States Army Corps Engineers ("USACE") as a Water of the United States.  On May 2011, plaintiff Mamer made the Seeno Defendants aware of a number of administrative environmental permit violations at Coyote Springs.  On June 2011, plaintiff Mamer made the Seeno Defendants aware of environmental violations related to a threatened species located at Coyote Springs, the Desert Tortoise, in possible violation of the Endangered Species Act.  Plaintiff Mamer asserts this decade-long history demonstrates a pattern of knowing and intentional willful disregard for state and federal environmental regulations and laws.

112.   On information and belief, while Nevada gaming regulators, commissioners and board members based the Nevada Gaming Settlement on the Red Legged Frog Settlement, they appear not to have been aware, or decided not to prosecute, the more significant repeat Water Pollution Settlement.

113.   The Water Pollution Settlement included a permanent injunction (the "Permanent Injunction") agreed to by the Seeno Company, its affiliated companies and entities, its managing partner (Seeno, Jr.), and all other related entities and their owners, partners, officers, employees, subsidiary corporations, or other entities acting by, though, under, or on behalf of, the Albert D. Seeno Construction Company, with actual or constructive knowledge of the Water Pollution Settlement (collectively, "Enjoined Parties"). It seems beyond dispute that WNG HOLDING, as a wholly owned affiliate of the Seeno Defendants, falls under the scope of this Permanent Injunction as an Enjoined Party.

114.   The Permanent Injunction required, among other penalties, a mandatory five (5) year environmental instructional program for all Enjoined Parties.  Said program, pursuant to the Water Pollution Settlement, commenced in 2007 through 2011.  Under this agreement, Seeno, Jr. agreed, on behalf of his enjoined affiliates, to implement a course of instruction for all employees to explain the legal requirements relating to environmental, water quality, wetlands and habitat conservation and protection, which shall instruct the employees in the appropriate methods for compliance with such requirements under environmental laws, including by not limited to NEPA, CEQA, CWA and the ESA.  It seems beyond dispute that Seeno, Jr. and Seeno, III were held to a higher legal standard as a result of this agreement.  In addition, it is apparent to plaintiff Mamer how Seeno, III gained the knowledge of environmental laws he bragged about while making extortionate threats against BrightSource Energy (See paragraph 64).

115.   During the term of plaintiff Mamer's employment with and for the Seeno Defendants, such environmental training was never discussed nor implemented for employees of WNG MANAGEMENT, a WNG HOLDING affiliate.  On or around early 2011, Evola mentioned the Seeno Company had such a program to plaintiff Mamer, but at that time, plaintiff

Mamer was unaware of the scope of the Water Pollution Settlement.

116.   The Permanent Injunction included a prohibitory term that the Enjoined Parties agreed to be **permanently enjoined** (emphasis added) from, among other things, (i) committing violations of the federal Endangered Species Act, and (ii) committing violations of the federal Clean Water Act.   On information and belief, Seeno, III's knowing and intentional orders to remove septic holding tanks and install septic holding systems in an area within or near Waters of the United States may be in violation of this permanent injunction.   On information and belief, the Seeno Defendants' knowing and intentional disregard for Desert Tortoise permit conditions at Coyote Springs may be in violation of this permanent injunction.

117.   Plaintiff Mamer contends defendant Ghiorso willfully and intentionally participated with the Seeno Defendants to deny plaintiff Mamer his rights under the Relocation Agreement.   On information and belief, defendant Ghiorso's participation's in activity he reasonably believed, or should have believed, was illegal may be a violation of state and federal laws.

118.   Defendant McCauley willfully and intentionally ordered plaintiff Mamer to (i) fabricate a project history that excluded Whittemore from any benefit related to the Capital Loss Project, and (ii) to fabricate a project history that advanced false claims, in plaintiff Mamer's opinion, against Whittemore related to the Fraudulent Misrepresentation Project.   On information and belief, defendant McCauley's willful and intentional orders may be in violation of ethics requirements pursuant to his CPA license should McCauley take steps to renew his license.   On information and belief, defendant McCauley's willful and intentional orders may be in violation of federal tax laws.

119.   As senior executives, plaintiff Mamer and defendant Cargill worked closely together for over five (5) years.   This included multiple and daily communications, frequent face-to-face meetings, complex work sessions, and occasional joint business trips.   Plaintiff Mamer and defendant Cargill also enjoyed a non-work friendship, which Cargill also shared for many years with plaintiff Mamer's wife, Christina M. Mamer.   Over this period, on information and

belief, defendant Cargill never expressed doubt to any WNG MANAGEMENT staff as to plaintiff Mamer's credibility, and in contrast was a frequent supporter of his contributions to the company.  On no occasion did defendant Cargill express to plaintiff Mamer her doubt as to the legitimacy of his claims regarding the described "Seeno Way" threat, the unpermitted "Septic System Installations", or the Whittemore and BrightSource Energy threats all perpetrated by Seeno, III.  Similarly, on information and belief, at no time prior to the Bustos Report did defendant Cargill make management aware that plaintiff Mamer was making "false allegations" about Seeno, III, pursuant to WNG MANAGEMENT policy and her responsibility as General Counsel for the company.

120.    Plaintiff Mamer contends defendant Cargill willfully and intentionally participated with the Seeno Defendants to deny his rights under the Relocation Agreement.  On information and belief, defendant Cargill's failure to report illegal activity she reasonably believed was true may be in violation of Cargill's obligations as an officer of the court.  On information and belief, defendant Cargill's failure to similarly report such activity to all ~~to all~~ of the "Managers" of WNG HOLDING, including Whittemore during such times as he remained a Manager of WNG HOLDING, may be in violation of Cargill's fiduciary obligations as an executive of WNG MANAGEMENT.  On information and belief, Cargill's failure to report threats of physical violence, including intimidation, harassment and/or coercion made by Seeno, III, and reported by plaintiff Mamer, was in violation of WNG MANAGEMENT policy, and may be in violation of state employment law.  On information and belief, defendant Cargill's participation in activity she reasonably believed, or should have believed, was illegal may be a violation of state and federal laws.

121.    For over a year plaintiff Mamer has lived under the fear of death or serious bodily injury because of the threat made by Seeno, III against him, threats of severe bodily harm Seeno, III ordered plaintiff Mamer convey to Whittemore, extortionate threats Seeno, III ordered plaintiff Mamer convey to BrightSource, and other unlawful conduct of Seeno, Jr. and Seeno, III that he witnessed.  Plaintiff Mamer took these threats seriously because of Seeno, Jr.'s and Seeno, III's

association with criminal elements, including known felons and members of the Hell's Angels. Plaintiff Mamer and his family lived under and continue in fear for their lives and their well-being.

122.   For over a year, including the period of management of WNG HOLDING by Albert Seeno, Jr., plaintiff Mamer has lived under the fear that he may be implicated or found liable for bad acts perpetrated by Seeno, Jr., Seeno III, and defendant McCauley.  Plaintiff Mamer expressed these concerns to Whittemore on numerous occasions.

123.   Based on the safety for himself and his family, shortly after emailing the Bustos Report to Cargill and Cassity's [WNG MANAGEMENT'S] response, plaintiff Mamer took actions to protect himself and his family including: (i) contacting his homeowners association security and requesting his property be placed on heightened alert, removing Cargill's name from his list of authorized guests, and requesting Whittemore call his sister, Ellen Whittemore, who also lived in the same community as plaintiff Mamer, to similarly remove Cargill from her list of authorized guests, (ii) discussions with representatives of the U.S. Attorney's office, (iii) discussion and subsequent meetings with special agents from the Federal Bureau of Investigation ("FBI"), and (iv), preserving his testimony with a sworn video statement.  This was in the event that Seeno, III made good on the threats, and to give the police a place to start if anything happened to plaintiff Mamer or his family.

124.   Based on his fear of being implicated or found liable for bad acts perpetrated by Seeno, Jr., Seeno, III, and defendant McCauley, plaintiff Mamer took actions to protect himself, his family, and his reputation including: (i) filing a civil complaint related to the Septic System Installations with the SNHD, (ii) filing a civil complaint related to possible violations of the CWA with the ACOE, (iii) filing a civil complaint related to possible violations of the CWA and ESA with the USFWS, (iv), meeting with and providing the FBI with sworn statements regarding extortionate threats Seeno, III ordered plaintiff Mamer communicate to Whittemore and BrightSource Energy, and (v), providing sworn statements to the IRS regarding possible violations of federal tax law ordered by defendant McCauley.  On information and belief, all

agencies are investigating these allegations.

125.   The Seeno Defendants have engaged in a continuous pattern of unlawful conduct including violation of environmental regulations and laws, criminal conduct directed against plaintiff Mamer, or coercing his participation against other parties, all in an attempt to intimidate plaintiff Mamer against lawful rights to which he was entitled, the collection of an unlawful debt, an attempt to evade federal taxes, and in an effort to again coerce his participation in the Seeno Defendants' unlawful efforts against Whittemore and BrightSource Energy.  For personal gain, the Seeno Defendants have engaged in dishonest and fraudulent actions meant to gain an advantage or terminate binding agreements with Pardee Homes and BrightSource Energy, all of which has harmed plaintiff Mamer's interest in affiliates of WNG HOLDING.

126.   On information and belief, Seeno, Jr. and/or Seeno, III, or other employees of the Seeno Company, are Nevada-licensed contractors.  On information and belief, RHL did not have a valid Nevada contractor's license for the failed demolition, stonework, roofing, plumbing and electrical work it completed on Mamer's Sparks residence, and which is the subject of the Mamer A/R.  On information and belief, Seeno, Jr. and/or Seeno, III, therefore, realized, or should have realized, the debt was unlawful and uncollectible.

127.   Plaintiff Mamer has suffered severe physical, mental and emotional distress because of the threats and other actions taken by the Seeno Defendants and their named and unnamed associates.

**FIRST CAUSE OF ACTION**
**(Violation of Racketeer Influenced and Corrupt Organization Act,**
**18 USC §1961, et seq.; 18 USC §1962(a); 18 USC 1964(c) 18 USC §§1341, 1343)**

128.   Plaintiff Mamer repleads and realleges each and every allegation set forth in Paragraphs 1 through 127, inclusive, of the Complaint, and incorporates the same by this reference as though set forth in full herein.

129.   18 USC §1964 provides that the district courts of the United States shall have jurisdiction over violations of 18 USC §1962.  Subsection (c) of 18 USC §1964 provides that "[a]ny person injured in his business or property by reason of a violation of section 1962…may

sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and cost of suit, including a reasonable attorney's fee…".

130.    18 USC 1962 does not confer exclusive jurisdiction on the courts of the United States.  Jurisdiction under 18 USC 1962 is concurrent so that suit may be brought in state or federal court for violations of 18 USC 1962.

131.    Defendants operate in and effect interstate commerce.

132.    By threatening physical harm ("Seeno Way") of plaintiff Mamer unless he 'forgot' his relocation agreement and the right to $375,000.00 compensation according to express term of the agreement, Defendant Albert Seeno, III violated NRS 205.320, in addition to other state statutes, which impose punishment or imprisonment for more than one year.  NRS 205.320 provides in relevant part:

> A person who, with the intent to extort or gain any money or other property or to compel or induce another to make, subscribe, execute, alter or destroy any valuable security or instrument or writing affecting or intended to affect any cause of action or defense, or any property, or to influence the action of any public officer, or to do or abet or procure any illegal or wrongful act, whether or not the purpose is accomplished, threatens directly or indirectly:

> To accuse any person of a crime;

> To injure a person or property;

> To publish or connive at publishing any libel; is guilty of a category B felony and shall be punished by imprisonment in the state prison for a minimum term of not less than one (1) year and a maximum term of not more than ten (10) years, or by a fine of not more than $10,000, or by both fine and imprisonment.

133.    In addition to Defendant Albert Seeno, III's express threat of harm to plaintiff Mamer, Seeno III's telephone call demanding Mamer convey to Whittemore, Seeno, III's threat to break Whittemore's legs and take away his life reinforced Mamer's belief of Seeno, III's propensity to use violence to discipline employees.

134.    Making threats of murder or other harm for the purpose of extortion is defined as "racketeering activity" in 18 USC §1961.

135.    The Defendants have used the United States mail and/or telephone service in interstate commerce in order to extort money from plaintiff Mamer, thereby committing mail and/or wire fraud in violation of 18 USC §1341 and 18 USC §1343.  Mail and wire fraud are

defined in 18 USC §1961 as "racketeering activity".

136.    18 USC §1962(a) provides that it is unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity to use or invest any part of such income in acquisition of any interest in the establishment or operation of an enterprise which is engaged in or effects interstate commerce. The Defendants, through the mail, wire and other fraud and illegal activity mentioned herein have received income taken from plaintiff Mamer on several occasions and which they have invested in the establishment and operation of their affiliated companies ("Enterprise") affecting interstate commerce and engaged in further illegal activity. Defendants have received and invested income in the enterprise on more than two occasions. Through extortion, the Defendants have been able to misappropriate Mamer's funds to their own use and have invested those funds in the acquisition, establishment and operation of an enterprise that is engaged in and affects interstate commerce.

137.    Defendants' misappropriation of plaintiff Mamer's funds through the use of threat of physical harm and the further investment of those monies in an enterprise affecting interstate commerce has been the direct and proximate cause of damage to plaintiff Mamer in the amount of $375,000.00. On information and belief, the enterprise has, since its formation, committed wire and mail fraud by also filing false tax returns and other tax documents with the United States government since receipt of the funds received from the racketeering activity of the Defendants. Pursuant to 18 USC §1964 (c), any damages awarded to plaintiff Mamer must be trebled.

138.    Plaintiff Mamer has been forced to hire an attorney to prosecute his claims and, pursuant to 18 USC §1964(c), is entitled to his reasonable attorney's fees and costs for prosecuting this action.

### SECOND CAUSE OF ACTION
**(Violation of Racketeer Influenced and Corrupt Organization Act,
18 USC §1961, et seq., 18 USC §1962(c), 18 USC §1964(c) 18 USC §§1341, 1343)**

139.    Plaintiff Mamer repleads and realleges each and every allegation set forth in Paragraphs 1 through 138, inclusive, of the Complaint, and incorporates the same by this reference as though set forth in full herein.

140.    The Defendants' unauthorized and unlawful collection of the amount allegedly due for RHL's repairs and remodeling of plaintiff Mamer's Sparks residence without a contractor's license is a violation NRS 624.320, which prohibits the collection of compensation for construction work in the absence of a contractor's license.

141.    By threatening physical harm ("Seeno Way") of plaintiff Mamer unless he acquiesced in the unauthorized payroll deductions violated NRS 205.322, in addition to other state statutes that impose punishment or imprisonment for more than one year.  NRS 205.322 provides in relevant part:

A person who causes a debtor to have a reasonable apprehension that a delay in repaying the debt could result in the use of violence or other criminal means to:

Harm physically the debtor or any other person;

is guilty of extortionate collection of debt which is a category B felony and shall be punished by imprisonment in the state prison for a minimum term of not less than one (1) year and a maximum term of not more than six years, and may be further punished by a fine of not more than $10,000.

142.    Making threats of murder or other harm for the purpose of extortion is defined as "racketeering activity" in 18 USC §1961.

143.    The Defendants have used the United States mail and telephone service in interstate commerce in order to extort money from plaintiff Mamer, thereby committing mail and/or wire fraud in violation of 18 USC §1341 and 18 USC §1343.  Mail and wire fraud are defined in 18 USC §1961 as "racketeering activity."

144.    Defendants' extortion of money from plaintiff Mamer through the use of threat of physical harm and the further investment of those monies in an enterprise affecting interstate commerce has been the direct and proximate cause of damage to plaintiff Mamer in a sum in excess of $10,000.00.   On information and belief, the enterprise has, since its formation, committed wire and mail fraud by also filing false tax returns and other tax documents with the United States government since receipt of the funds received from the racketeering activity of the Defendants.  Pursuant to 18 USC §1964 (c), any damages awarded to Plaintiff Mamer must be

1    trebled.

2         145.    Plaintiff Mamer has been required to engage the services of an attorney to

3    prosecute this action and, pursuant to 18 USC §1964(c), is entitled to his reasonable attorney's

4    fees and costs for prosecuting this action.

5    **THIRD CAUSE OF ACTION**
     **(Declaratory Relief pursuant to 28 U.S.C. § 2201)**

6         146.    Plaintiff Mamer repleads and realleges each and every allegation set forth in

7    Paragraphs 1 through 145, inclusive, of the Complaint, and incorporates the same by this

8    reference as though set forth in full herein.

9         147.    The Relocation Agreement states "Should Executive's [Mamer's] employment be

10   terminated, or should there be a material change in his executive compensation, Executive shall

11   have the right to list and sell the Las Vegas [Mamer's] Residence, in his sole discretion, upon

12   sixty (60) days written notice to the Company."

13        148.    Upon the sale of the residence at a loss, plaintiff Mamer is entitled to collect his

14   total investment in the home, $375,000.00, from the sale proceeds, or the company.

15        149.    By letter dated February 23, 2011, Albert Seeno, Jr., through his counsel, denied

16   plaintiff Mamer's right to collect his investment if the home was sold, and instead, citing a

17   nonexistent paragraph of the Relocation Agreement, stated "the only situation in which monies

18   may be due you . . . if you decide to move to Coyote Springs . . ."

19        150.    Between March 2006, when the Relocation Agreement was executed and February

20   2011, plaintiff Mamer's salary was reduced 40%; a material change in his compensation.

21        151.    As a result of the material reductions in his compensation, plaintiff Mamer

22   suffered extreme financial hardship depleting savings and significantly changing his family's

23   lifestyle to preserve his good credit because he could no longer afford the mortgage payments and

24   other costs of living in the residence.

25        152.    WNG MANAGEMENT created dangerous and harassing working conditions that

26   included threats of violence against plaintiff Mamer and coercion to relay threats of violence to

27   another WNG MANAGEMENT employee.

28

153.    Defendant Seeno, III, with apparent authority of WNG MANAGEMENT, threatened plaintiff Mamer with his explanation in obscene detail of the 'Seeno Way' for dealing with people who failed to meet the Seenos' expectations; a management practice that included sodomy without the benefits of lubrication.

154.    Defendant Seeno, III demanded plaintiff Mamer contact fellow WNG MANAGEMENT employee, F. Harvey Whittemore, and tell him that if a CSI business partner did not pay CSI, Seeno, III would break Whittemore's legs, and further stated, "I will take away his life if we don't get our money."

155.    WNG MANAGEMENT had actual knowledge of the outrageous and criminal actions of defendant Seeno, III and the impact on plaintiff Mamer as he informed WNG MANAGEMENT Senior Vice President and General Counsel, defendant Cargill.

156.    WNG MANAGEMENT could have remedied the intolerable working conditions by enforcing its employment policies, specifically Section 3.1 of the Employee Handbook titled Prohibited Conduct: threatening, committing or encouraging any act of violence in the workplace or against any employee of the Company.

157.    Notwithstanding WNG MANAGEMENT'S actual knowledge of defendant Seeno, III's conduct in violation of employment policies and Nevada law, WNG MANAGEMENT did nothing to remedy the intolerable working conditions that included threats of violence and illegal conduct, thereby, constructively discharging/terminating plaintiff Mamer's employment.

158.    According to the Relocation Agreement, the fair market value of the residence in March 2006 was $1,550,500. Conversely, in the spring of 2011, the fair market value of the home was approximately half of the 2006 value according to area real estate brokers.

159.    In the absence of the recovery of plaintiff Mamer's investment in the home as promised in the Relocation Agreement, he cannot sell the home in an effort to preserve his credit because he is unable to pay off the existing mortgage at time of sale necessary to deliver clear title as required by law.

160.    Plaintiff Mamer requests Declaratory Relief pursuant to 28 U.S.C. § 2201 by way

of an order declaring the reduction in plaintiff Mamer's compensation was a material change in his compensation and/or his employment was terminated, and therefore, according to the terms of the Relocation Agreement, plaintiff Mamer is entitled to recover his total investment of $375,000.000 upon the sale of the residence.

161.    As a proximate result of WNG MANAGEMENT'S anticipatory breach of the Relocation Agreement, Mamer has been forced to retain the services of an attorney to assert his legal claims, and therefore, is entitled to his attorney's fees and costs.

## FOURTH CAUSE OF ACTION
### (Violation of Family and Medical Leave Act ("FMLA") 29 U.S.C. § 2601, et seq.)

162.    Plaintiff Mamer repleads and realleges each and every allegation set forth in Paragraphs 1 through 161, inclusive, of the Complaint, and incorporates the same by this reference as though set forth in full herein.

163.    Prior to his relocation to Las Vegas, plaintiff Mamer requested and was granted family medical leave accommodations to care for his son with special needs as a result of the removal of a brain tumor at the age of 10 months.

164.    Upon the relocation of WNG MANAGEMENT'S executive offices from Las Vegas to Coyote Springs, approximately sixty miles northeast of Las Vegas, in the spring of 2008, plaintiff Mamer requested and was granted additional family medical leave accommodations to care for his disabled son.

165.    As a result of the relocation of the work site to Coyote Springs, plaintiff Mamer's commute time to work was increased by over one and one-half hours each day.

166.    By agreement with WNG MANAGEMENT, plaintiff Mamer was granted flexible work hours, including working through the lunch hour, in order to remain home in the early morning to provide critical assistance to his son for the timely administration of medications, preparing for and transportation to school, and then later in the day, picking up his son from school aftercare, administration of medications, and assisting with homework.

167.    On March 23, 2011, defendant Ghiorso, acting with apparent authority of WNG MANAGEMENT, ordered plaintiff Mamer to be at the Coyote Springs work site from 8:00 AM

to 6:30 PM Monday through Friday, and later on April 25th, again increased plaintiff Mamer's work hours to 7:00 AM through 6:00 PM.

168.   Notwithstanding plaintiff Mamer's explanation of the need to accommodate his son's serious health condition, Ghiorso denied his request for a later arrival and earlier departure from the Coyote Springs work site, and thereby, WNG MANAGEMENT interfered with plaintiff Mamer's continued exercise of his right to FMLA leave in violation of U.S.C. § 2615(a).

169.    As a proximate result of WNG MANGEMENT'S unlawful conduct, plaintiff Mamer incurred damages in the way of expenses for alternative medical assistance for his son in an amount to be proven at trial.

170.   As a proximate result of WNG MANAGEMENT'S unlawful conduct and plaintiff Mamer's inability to always make alternative arrangements for his son's medical assistance, plaintiff Mamer's seventeen-year exemplary performance reputation was damaged by defendant Ghiorso's forced unauthorized leave from work: late arrivals and early departures, in an amount to be proven at trial.

171.   Plaintiff Mamer has been required to engage the services of an attorney to prosecute this action and, pursuant to 18 USC §2617, is entitled to his reasonable attorney's fees, expert witness fees and costs for prosecuting this action.

### FIFTH CAUSE OF ACTION
### (Violation of Fair Labor Standards Act ("FLSA") 29 U.S.C. § 201, et seq.)

172.   Plaintiff Mamer repleads and realleges each and every allegation set forth in Paragraphs 1 through 171, inclusive, of the Complaint, and incorporates the same by this reference as though set forth in full herein.

173.   On March 23, 2011, defendant Ghiorso ordered plaintiff Mamer to be at the Coyote Springs work site from 8:00 AM to 6:30 PM Monday through Friday, and later on April 25th, again increased his work hours to 7:00 AM through 6:00 PM.

174.   Notwithstanding plaintiff Mamer's demand for overtime compensation, WNG MANAGEMENT failed and refused payment erroneously claiming an administrative exemption to the 29 U.S.C. §207 requirement to compensate employees at a rate of one and one-half their

regular rate for all hours in excess of a 40 hour workweek.

175.    As a proximate result of WNG MANAGEMENT'S unlawful conduct, plaintiff Mamer incurred damages for unpaid overtime compensation in excess of $25,000.00.

176.    Plaintiff Mamer has been required to engage the services of an attorney to prosecute this action and, pursuant to 29 USC §216, is entitled to his reasonable attorney's fees, and costs for prosecuting this action.

## SIXTH CAUSE OF ACTION
### (Breach of Contract)

177.    Plaintiff Mamer repleads and realleges each and every allegation set forth in Paragraphs 1 through 176, inclusive, of the Complaint, and incorporates the same by this reference as though set forth in full herein.

178.    The Wingfield Nevada Group Management Company Employee Handbook ("Employee Handbook") constitutes a valid, binding, and enforceable contract defining the mutual duties of conduct for both Employer and Employee.

179.    At all times relevant to his Complaint, plaintiff Mamer was an employee of the Wingfield Nevada Group Management Company.

180.    According to Section II, B, Administration of Ethics Policy: "All employees have an obligation to report immediately any suspected violations of this policy . . . such reporting should be to the employee's immediate supervisor . . . such supervisor . . . will investigate the report and take corrective action, if necessary.  The Company will not act against an employee for reporting a potential violation of this policy."

181.    According to Section V., Ethical Business Conduct, subsection A., "The Company's business must be conducted in strict conformance with the highest ethical standards and all applicable laws and regulations."  Further, A.6. defines an unethical and unlawful business practice as: "Knowingly doing business with any person who (a) has been determined to be unsuitable to be associated with a gaming enterprise by the Nevada Gaming Commission or other Gaming Authorities, (b) is included in the Nevada List of Excluded Persons, or (c) is commonly and publicly considered to be notorious and unsavory by virtue of their conduct or their affairs."

182.     Section 3.1, defines Prohibited Conduct to include, engaging in criminal conduct, whether or not related to job performance, violating ethical standards or conduct rules discussed in this Handbook, violation of any safety, health, security or Company rule, threatening, committing or encouraging any act of violence in the workplace or against any employee of the Company.

183.     On September 18, 2011, plaintiff Mamer reported to his immediate supervisor, Emilia K. Cargill ("Cargill"), Senior Vice President and General Counsel, suspected violations of the WNG MANAGEMENT Employer-Employee conduct policies, notably, Albert D. Seeno, Jr. and Albert D. Seeno, III, WNG Management executives signing the "Word of Welcome", page 4 of the Employee Handbook, alleged association with persons determined to be unsuitable by the Nevada Gaming Commission, or commonly and publicly considered to be notorious and unsavory, Albert Seeno III's threats of violence against employees plaintiff Mamer and Whittemore, and Albert Seeno III's ordered unlawful installation of a septic system and trespass on another's land.

184.     In response to his September 18th report to Cargill, plaintiff Mamer received a letter dated September 20th from Nancy Cassity, Human Resource Manager, that stated: "I am writing in response to a highly inflammatory and inappropriate email you sent to Emilia Cargill on Sunday, September 18, 2011 . . . all the allegations and statements you made in your letter . . . are untrue and highly slanderous.   In addition, making derogatory comments about other personnel is considered 'prohibited conduct' under Policy 3.1 of the Company personnel manual. You are directed to cease and desist from spreading these unsubstantiated and untrue statements. If you do not, you will be subject to discipline up to and including termination."

185.     Cargill failed to investigate the suspected violations reported in plaintiff Mamer's September 18th email, and thereby, breached her duty according to the Ethics Policy.

186.     In addition to the Cargill's failure to investigate and the company's promise "not to take action against an employee for reporting a potential violation" of the Ethics Policy, WNG MANAGEMENT retaliated against plaintiff Mamer by threatening "discipline up to and

including termination" for "spreading these unsubstantiated and untrue statements."

187.   As a proximate result of WNG MANAGEMENT'S breaches of the contract, plaintiff Mamer is entitled to equitable relief in the way of the rescission of the contract; the Wingfield Nevada Group Management Company Employee Handbook.

188.   As a proximate result of WNG MANAGEMENT'S breaches of the contract, Mamer has been forced to retain the services of an attorney to assert his legal claims, and therefore, is entitled to his attorney's fees and costs.

**SEVENTH CAUSE OF ACTION**
**(Violation of Racketeer Influenced and Corrupt Organization Act,**
**(18 USC §1962(d), 18 USC §1962(c), 18 USC §§1341, 1343)**

189.   Plaintiff Mamer repleads and realleges each and every allegation set forth in Paragraphs 1 through 188, inclusive, of the Complaint, and incorporates the same by this reference as though set forth in full herein.

190.   Defendant McCauley, at the request of and for the benefit of the Defendants Seenos, on more than one occasion instructed plaintiff Mamer in person, by U.S. Mail, Facsimile and E-Mail to alter company records and/or fabricate false company records for the purpose of defrauding former business partner F. Harvey Whittemore and the United States Internal Revenue Service.

191.   The Defendants have used the United States mail and wire service in interstate commerce in order to defraud F. Harvey Whittemore and the United States Internal Revenue Service, thereby, committing mail and/or wire fraud in violation of 18 USC §1341 and 18 USC §1343 respectively.  Mail and wire fraud are defined in 18 USC §1961 as "racketeering activity".

192.   The Defendants have unlawfully conspired, as defined in 18 U.S.C. §1962(d), to defraud, and therefore, have conducted or participated in the conduct of the affairs of an enterprise that effects interstate commerce through a pattern of racketeering activity.

193.   As a direct and proximate result of the Defendants' racketeering activity, plaintiff Mamer was forced to quit his employment to renounce the conspiracy and has incurred damages in the amount of lost wages in excess of $135,000.00, which sum, pursuant to 18 USC §1964(c),

1    must be trebled.

2         194.    Plaintiff Mamer has been required to engage the services of an attorney to

3    prosecute this action and, pursuant to 18 USC §1964(c), is entitled to his reasonable attorney's

4    fees and costs for prosecuting this action.

5                                    **EIGHTH CAUSE OF ACTION**

6    **(Violation of Racketeer Influenced and Corrupt Organization Act,
     18 USC §1962(d), 18 USC §1962(c), 18 USC §§1341, 1343)**

7         195.    Plaintiff Mamer repleads and realleges each and every allegation set forth in

8    Paragraphs 1 through 194, inclusive, of the Complaint, and incorporates the same by this

9    reference as though set forth in full herein.

10        196.    Defendants Seenos, Ghiorso and Cargill devised a scheme to obtain money by

11   denying plaintiff Mamer his relocation allowance, unlawfully collecting a debt and forcing him to

12   quit his employment by means of threats of violence, false or fraudulent pretenses,

13   representations, or promises all of which are defined as racketeering activities by 18 U.S.C.

14   §1961.

15        197.    The Defendants have used the United States mail and wire service in interstate

16   commerce in order to carry out their unlawful scheme, thereby, committing mail and/or wire

17   fraud in violation of 18 USC §1341 and 18 USC §1343 respectively.  Mail and wire fraud are

18   defined in 18 USC §1961 as "racketeering activity".

19        198.    The Defendants have unlawfully conspired, as defined in 18 U.S.C. §1962(d), to

20   carry out their scheme, and therefore, have conducted or participated in the conduct of the affairs

21   of an enterprise that effects interstate commerce through a pattern of racketeering activity.

22        199.    As a direct and proximate result of the Defendants' racketeering activity, plaintiff

23   Mamer has incurred damages in the amount of lost wages in excess of $500,000.00, which sum,

24   pursuant to 18 USC §1964(c), must be trebled.

25        200.    Plaintiff Mamer has been required to engage the services of an attorney to

26   prosecute this action and, pursuant to 18 USC §1964(c), is entitled to his reasonable attorney's

27   fees and costs for prosecuting this action.

28

1

2

**NINTH CAUSE OF ACTION**
**(Violation of Racketeer Influenced and Corrupt Organization Act,**
**18 USC §1962(d), 18 USC §1962(c), 18 USC §§1341, 1343)**

3

4

5

201.    Plaintiff Mamer repleads and realleges each and every allegation set forth in Paragraphs 1 through 200, inclusive, of the Complaint, and incorporates the same by this reference as though set forth in full herein.

6

7

8

202.    Plaintiff Mamer owns a profit interest in two entities that are part of the Wingfield Nevada Group Holding Company, LLC: Coyote Springs Investment LLC ("CSI"); and Red Hawk Land Company, LLC ("RHL").

9

10

203.    CSI entered contracts with Pardee Homes and BrightSource Energy, with the potential to ensure the long-term viability of CSI, and consequently, profits to plaintiff Mamer.

11

12

13

204.    Under the false representation of managing CSI in the best interests of the holders of member interests, the Seenos are instead scheming to appropriate the CSI's main asset, land, for their exclusive benefit and to the detriment of CSI profits.

14

15

16

17

18

205.    The Seenos have breached their fiduciary duty to plaintiff Mamer by interfering with CSI's contractual relations with Pardee Homes and BrightSource Energy through bad faith and unlawful conduct and frivolous claims meant to terminate the contracts, and thereby, free up land that the Seenos can use in a federal land swap of CSI's land for land more valuable to the Seenos' Northern California business ventures.

19

20

21

22

206.    The Defendants have used the United States mail and wire service in interstate commerce in order to carry out their unlawful scheme, thereby, committing mail and/or wire fraud in violation of 18 USC §1341 and 18 USC §1343 respectively.   Mail and wire fraud are defined in 18 USC §1961 as "racketeering activity".

23

24

25

207.    The Defendants have unlawfully conspired, as defined in 18 U.S.C. §1962(d), to carry out their scheme, and therefore, have conducted or participated in the conduct of the affairs of an enterprise that effects interstate commerce through a pattern of racketeering activity.

26

27

208.    As a direct and proximate result of the Defendants' racketeering activity, plaintiff Mamer's profit interest has been damaged in the amount in excess of $1,000,000.00, which sum,

28

pursuant to 18 USC §1964(c), must be trebled.

209. Plaintiff Mamer has been required to engage the services of an attorney to prosecute this action and, pursuant to 18 USC §1964(c), is entitled to his reasonable attorney's fees and costs for prosecuting this action.

**TENTH CAUSE OF ACTION**
**(Intentional Infliction of Emotional Distress)**

210. Plaintiff Mamer repleads and realleges each and every allegation set forth in Paragraphs 1 through 209, inclusive, of the Complaint, and incorporates the same by this reference as though set forth in full herein.

211. The extreme and outrageous conduct of the Defendants herein described was with either the intention of, or reckless disregard for, cause emotional distress.

212. Plaintiff Mamer has suffered severe and extreme emotional and physical distress, negatively impacting his health and his ability to enjoy life requiring medical and psychological treatment due to the actions and threats of the Defendants.

213. The severe and extreme emotional and distress directly and proximately was caused by the Defendants' conduct.

214. As a direct and proximate result of the Defendants' misconduct, plaintiff Mamer has been damaged in a sum in excess of $10,000.

215. The actions of the Defendants described herein were done with oppression, fraud or malice.

216. Plaintiff Mamer is entitled to an award of punitive damages in a sum sufficient to punish the Defendants and to deter them from taking such actions again.

217. Plaintiff Mamer has been required to engage the services of an attorney to prosecute this action and, therefore, is entitled to his reasonable attorney's fees and costs for prosecuting this action.

/ / /

/ / /

/ / /

**WHEREFORE**, Plaintiff, Bradley J. Mamer, prays for judgment against Defendants, as follows:

1.      That Mamer be awarded judgment and general damages against Defendants in an amount in excess of $1,000,000.00, to be determined at trial, plus interest thereon at the legal rate;

2.      That Mamer be awarded in excess of $1,000,000.00 for special damages, according to proof;

3.      That Mamer be awarded in excess of $1,000,000.00 for punitive and exemplary damages

4.      That the Court declare Mamer's compensation has been materially changed and/or his employment terminated, and therefore, entitled to collect $375,000.00 as per the terms of the Relocation Agreement'

5.      That the Wingfield Nevada Group Management Company Employee Handbook is rescinded;

6.      That Mamer be awarded his attorney's fees and costs incurred in this matter; and

7.      For such other and further relief as the Court deems just and proper in the premises.

**DEMAND FOR TRIAL BY JURY**

Plaintiff, pursuant to F.R.C.P. 38(b), demands a trial by jury in this matter.

**DATED** this 8th day of September, 2012.


By  /s/ Bruce R. Mundy

BRUCE R. MUNDY, ESQ.
Nevada Bar No. 6068
200 South Virginia Street, Eighth Floor
Reno, NV  89501
Telephone:  775-851-4228
Reno-attorney@sbcglobal.net
*Attorney for the Plaintiff*